## No. 17,666.

OLIN MATHIESON CHEMICAL CORPORATION *v.*
PHIL I. FRANCIS, ETC.
(301 P. [2d] 139)

Decided August 27, 1956.

162

Messrs. GRANT, SHAFROTH & TOLL, Mr. MORRISON SHAFROTH, Mr. HENRY W. TOLL, Mr. FRANK H. SHAFROTH, for plaintiff in error.

Messrs. CREAMER & CREAMER, for defendant in error.

Messrs. HENRY & KEATING, Messrs. RINN & CONNELL, Amici Curiae.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

THIS is a suit for an injunction and for damages brought by plaintiff in error, herein referred to as plaintiff, or by name, against defendant in error, referred to by name, or as defendant. The action is predicated on the Colorado Fair Trade Act, C.R.S. '53, 55-1-4. A temporary injunction was denied, and plaintiff's action was, on motion of counsel for defendant, dismissed. Plaintiff is here on writ of error.

The question presented is whether the "non-signer" clause of the Fair Trade Act is constitutional.

The complaint recites that plaintiff manufactures and sells firearms and ammunition under two trade-marks, viz. "Winchester" and "Western." It was alleged that these products were "fair-traded" in Colorado, by written agreements with retailers in this state. The record discloses that one such agreement, exhibit "B," was executed between plaintiff and Fisher Denver Co., a hardware dealer in Denver, who sold plaintiff's products. This contract consisted of two closely printed pages and was dated August 2, 1952. It provided that "The Purchaser (Fisher) will not (except as specifically permitted by statute) directly or indirectly advertise, offer for sale or sell at wholesale or at retail any of the Commodities to any buyer in any state in which at the time of such sale a Fair Trade Act shall be in effect, at less than the minimum wholesale and/or retail selling price at that time stipulated therefor in such state by the Manufacturer. This provision shall be construed to apply to any Commodities which the Purchaser may already have on hand or on order or in transit to the Purchaser from the Manufacturer." It is further provided: "The minimum wholesale and/or retail selling prices stipulated by Manufacturer for such Commodities in various states (2) are those now or hereafter designated and set forth in attached Price Lists, exclusive of all sales or excise taxes applicable to such wholesale and/or retail trade. Manufacturer may, at any time and from time to time, upon notice given to Purchaser in writing, amend or supplement this Agreement; change any of said stipulated minimum resale prices, or eliminate any of the commodities now listed, or add other commodities and stipulate minimum wholesale and/or retail prices therefor as the case may be. Any such amendment and supplement or any such change in any stipulated minimum wholesale and/or retail price, or

any ' such elimination from or addition to the lists of commodities, shall become effective forthwith upon receipt of such notice by Purchaser." The contract further provided: "This Agreement is not agreement of sale and purchase, and Purchaser by executing this Agreement does not in any way change or affect Manufacturer's right to select its own customers. Purchaser is bound by this Agreement only in respect to the Commodities set out and described in the annexed Price Lists which it may have to offer for sale or sell."

The printed contract also contained the following: "It is the agreement and intention of the Parties, hereto, that if any provision or part of this Agreement shall be held invalid, the remainder shall nevertheless be valid and binding upon the Parties; and no provision or part of this Agreement which may be held to be invalid shall be deemed to be an inducement to any other provision or part of this Agreement or to the execution by either Party to this Contract or any part thereof."

While the contract might be terminated by either party by giving ten days notice, it was also provided that the Agreement "shall remain in full force and effect with respect to all of such Commodities in the hands of the Purchaser or on order by the Purchaser or in transit to the Purchaser at the time of such termination."

The Fisher contract was the only one, according to this record, which was executed between plaintiff and any dealer in the State of Colorado. Under date of December 2, 1953, plaintiff by letter advised defendant of its claims, enclosing two copies of "Our Fair Trade contracts," and stated: "These prices are now in effect on our products. Under the Colorado Fair Trade Law, the Fair Trade price is binding upon persons who have not actually signed the Fair Trade Agreement, as well as signers of it. * * * We believe that Fair Trade will redound to the benefit of all *handlers and users of our products* and are hopeful that we may have your cooperation. May we hear from you favorably advising that

you will conform to *our Fair Trade policy.*" (Emphasis supplied.) Defendant did not "conform."

The Colorado Fair Trade Act, C.R.S. '53, 55-1-1, et seq., was enacted in 1937 and is found in Chapter 146 of the session laws of that year. The title to the act reads: "An act to protect Trade-Mark owners, distributors *and the public* against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade-mark, brand or name." (Emphasis supplied.)

Section 1 of the statute provides: "No contract relating to the sale or resale of a commodity which bears, or the label or container bears, the trade-mark, brand or name of the producer * * * of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Colorado by reason of any of the following provisions which may be contained in such contract: (a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller. * * * "

Section 4 of the Act provides: "Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this Act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

It will be noted that the statute authorizes contracts in respect to a commodity which is "in free and open competition with commodities of the same general class produced or distributed by others." The contention of plaintiff is to the effect that the exclusive manufacturer of a product may fix the retail price thereof upon the theory that when sold by one retailer, that article is in competition with the same product sold by another re-

tailer. It is plain that this contention does not fall within the intent or purpose of the statute.

The distinguished and learned trial judge in announcing his ruling in this case, among other things, said: "Plaintiff herein seeks a preliminary or temporary injunction to enjoin the Defendant from selling below a fixed minimum price certain trade-marked products manufactured by the Plaintiff but thereafter lawfully acquired by the Defendant. There exists no contract whatsoever between the Plaintiff and this Defendant, and the Plaintiff accordingly is proceeding under the so-called 'non-signer' clause of the Colorado Fair Trade Act, that being Section 4. * * * the Colorado Fair Trade Act stripped of its formalities and viewed in the light of actual practice, seems to this Court to be a legally unjustifiable attempt by the state legislature beyond the proper bounds of its police power to delegate to one class of persons, namely the manufacturer in the instant case, the right to set minimum prices for which its product must be sold by every retailer of said product within the state, solely, so far as the law is concerned by virtue of the fact that this Plaintiff may have a written contract fixing minimum prices with only one retailer located in the state; and that in fixing the minimum price the manufacturer is not restricted to or bound by any legislative standards, and his action, once made, is not thereafter subject to any review whatsoever.

"The argument is made that even though this Plaintiff has divested itself fully and completely of its ownership of the trade-named product that it nonetheless still has an interest in its product. * * * Such interest can never in this Court's opinion be paramount and superior to the rights of every person to the unfettered use of that which he legally owns. Of course the right to the free use of one's own property is subject to some restrictions, but it seems to this Court that most certainly a lawful incident of ownership is the right to fix for oneself the price for which he will sell that which he owns."

Considering what plaintiff characterized as "our Fair Trade policy," it strains the mental processes to discover anything therein not amounting to a right reserved to the plaintiff corporation to exercise in its uncontrolled and unrestricted discretion to do as it pleases with reference to the fixing of prices for its commodities and its reserved right to refuse to sell its products to any purchaser.

The contract sought to be enforced in the instant case is a much more elaborate if not dangerous method of price-fixing than that which has heretofore received the approval of some courts. It embraces terms which if enforced would constitute a straight-jacket control of prices of plaintiff's products, ever moving in the direction of monopoly.

The Colorado *Unfair* Practices Act, C.R.S. '53, 55-2-1, et seq., declares in section 16 thereof: "The General Assembly declares that the purpose of this article is to *safeguard the public against the monopolies and to foster and encourage competition* by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This article shall be liberally construed that its beneficial purposes may be subserved." Here, is a declaration of the public policy of the state established by the General Assembly. (Emphasis supplied.)

The depression following 1929 gave impetus to the movement for legislation which would allow the fixing of minimum resale prices. The first act, passed by the legislature of California in 1931 allowed a manufacturer to establish resale prices binding only on retailers who voluntarily entered into a contract with him. Such legislation apparently proved ineffective and two years later the California General Assembly amended the 1931 act to provide that such contract established a minimum price binding upon any person who had notice of it. Thereafter the states which adopted Fair Trade legislation embodied the non-signer clause which in effect per-

mits a manufacturer or wholesaler to fix minimum resale prices for his products.

We deem it unnecessary to review the Acts of Congress passed over a period of years in an attempt to clothe such legislatures with power to enact Fair Trade Laws which would not run afoul of the anti-trust statutes of the United States. Suffice it to say that they are all reviewed and their effect considered in many of the decisions we shall refer to.

Under the Miller-Tydings Act, 15 USCA §1, and the subsequent McGuire Act, 15 USCA §45, no question can be raised as to the validity of Fair Trade Acts so far as they relate to the parties actually entering into such contracts pursuant to the terms of such state legislation. In the instant case an attempt is made by plaintiff to bind a non-signer to a price fixing contract under the Colorado statute.

The Colorado Fair Trade Act became effective March 15, 1937. In *Old Dearborn Distributing Co. v. Seagram Distillers Corp.*, 299 U.S. 183, State Fair Trade Acts were held to be invalid as violative of the Sherman Anti-Trust Act. On August 17, 1937, the Act of Congress, known as the Miller-Tydings Amendment, became effective, in an attempt to change the rule announced in the Old Dearborn case. In May, 1951, the Supreme Court of the United States announced its decision in *Schwegmann Brothers v. Calvert Distributing Corporation,* 341 U.S. 284, 19 A.L.R. 2d 1119, holding that the non-signer provisions of the state fair trade acts were void and violative of the Sherman Anti-Trust Act, and were not protected by the Miller-Tydings Amendment to that legislation. Later, in an effort to obviate the effect of the ruling in the Schwegmann case, the so-called McGuire Act was adopted by the Congress.

It is contended by counsel for defendant that pursuant to the holding in *Grayson-Robinson Stores, Inc. v. Oneida, Ltd.,* 209 Ga. 613, 75 S.E. 2d 161, the Colorado Fair Trade Act, effective March 15, 1937, being contrary

to and inconsistent with the provisions of the Sherman Anti-Trust Act, at the time of its enactment was void ab initio, and that there being no subsequent reenactment of the statute by the Colorado General Assembly, there is no valid statute in this state under which plaintiff may demand relief.

In Re Interrogatories of the House of Representatives (decided March 2, 1953), 127 Colo. 160, 254 P. (2d) 853, disposes of this contention. We there held that the adoption and passage of the official report of the committee on statute revision by the General Assembly "would not only be evidence of the law, but in fact, would be the law itself, as an reenactment thereof." See, also, 82 C.J.S. 457, §274; *Quick v. City of Fairview,* 144 Okla. 231, 291 Pac. 95; *Cooper Motors v. Board of County Commissioners,* 131 Colo. 78, 279 P. (2d) 685.

It is also urged that even though there was a trend in the days of the depression to approve Fair Trade Acts, in recent years the tendency of State courts has been to declare such acts, and especially the "non-signer" clause thereof, unconstitutional. We are aware that the authorities on this question are not uniform, but are persuaded that the best reasoned cases are those in which such laws have been held unconstitutional. As stated by the Federal Trade Commission: " * * * the essence of resale price maintenance is control of price competition. Lack of adequate enforcement of the anti-trust laws leaves a broad field for the activities of organized trade groups to utilize it for their own advantage to the detriment of consumers." *Liquor Stores, Inc. et al. v. Continental Distillery Corporation,* (Fla. 1949), 40 S. 2d 371. While laws of this character are ostensibly for the protection of the consuming public, and most of them specifically so declare, we fail to perceive how a consumer of the merchandise manufactured by plaintiff and sold by it to defendant is in any way protected or benefited if he is required to pay a higher price for the commodity than the defendant is willing to accept and which will return

him a reasonable profit. Equally obscure is how this statute, if effective as apparently intended, can operate to accomplish its expressed purpose "to foster and encourage competition." We are not persuaded that plaintiff is entitled to additional protection merely because its brand name or trade-mark is on the commodity sold.

The reasoning in the case of *Liquor Store, Inc. v. Continental Distilling Corp.*, supra, was approved by the Supreme Court of Michigan in *Shakespeare Co. v. Lippman's Tool Shop Sporting Goods Co.*, 334 Mich. 109, 54 N.W. 2d 268 (decided in 1952), where the court said: " * * * the trial court nevertheless considered as we do, that the better reasoned view is that of the Florida Supreme Court in *Liquor Stores, Inc. v. Continental Distilling Corp.* holding an act of that character unconstitutional. As applied to non-signers of fair trade agreements that is the only view consistent with our reasoning in *People v. Victor*, 287 Mich. 506, 283 N.W. 666, 124 A.L.R. 316. We there held a statute forbidding the giving of a premium with the retail sale of gasoline unconstitutional * * * as constituting a deprivation of property without due process of law for the reason that the legislation was outside the scope of the police power of the state inasmuch as it bore no reasonable relation to public morals, health, safety or the general welfare. * * * It is urged, however, that the instant case is distinguishable from the Victor case in that it involves not alone the sale by the defendant of an article owned by it, but as well 'its wrongful appropriation of a person's property, to-wit: His good will and the recognized value of his trade-marks and established brand names.' This is followed by the suggestion that laws prohibiting theft, larceny or conversion do bear a relation to the public morals and welfare and that, by the same token, so does the act in question. But is plaintiff's good will, trademark or brand name wrongfully appropriated or stolen by defendant by means of its cut-rate sales? It may be that they are adversely affected thereby, as indeed, they

would be by a competitor's placing a better product on the market for less money. Does such adverse effect in and of itself constitute a violation of plaintiff's rights or a wrongful appropriation of its good-will? We think not. Trade-marks and brand names, together with the good-will attendant thereon, are protected in certain respects by act of congress. 15 U.S.C.A. §1051, et seq. The function of a trade-mark is simply to designate the goods as the product of a particular manufacturer or trader and to protect his good-will against the sale of another's product as his; to prevent confusion of the public regarding the origin of goods of competing vendors. It was for that purpose that the law created a protective shield around trade-marks, brand names and the good-will connected therewith. * * * Defendant's cut-rate sales have breached no such trade-mark rights of plaintiff. Plaintiff's trade-mark rights do not go as far as urged by it. *Sunbeam Corp. v. Wentling,* (3rd Cir.) 192 F. 2d 7. They do not enable it to sell its cake and have it, too. * * *."

The language employed in *Liquor Stores, Inc. et al. v. Continental Distilling Corporation,* supra, is most appropriate: "The courts have generally accepted the premise of the proponents of the act that it is in the interest of the general welfare to protect the property right in the trade-mark and brand. We may concede, though it is not beyond question and not necessary to discuss here, that the owner of a trade-mark and brand has a property right deserving the protection of law. Undoubtedly he has up to a point. Although without this act he has the protection afforded by the law in common to other properties. Is he entitled to more? If he claim additional advantage, then we must look to the law emanating from the police power. *If the advantage sought is personal as distinguished from the general public, then the police power may not be invoked.*" (Emphasis supplied.) The court further said: "This statute is, in fact, a price fixing statute. The power to fix the price is vested in an *interested person* who is not an

official. There is no review of his act. He is required to consult with no one and in no sense is required to take into consideration the cost of the article or the reasonableness thereof. We need look no further than our own jurisdiction for precedents to turn the decision. We have many times been confronted with price fixing statutes in one form or another. Throughout our holdings we have recognized as basic that for a statute such as this to be upheld there must be some semblance of a public necessity for the act and it must have some relation to the public health, morals and safety. Further, the price fixing agency must be duly constituted by law and due notice of its action given. All of which contemplates that the prices fixed must have some regard to reason besides having a public concern."

This holding is in accord with our decisions in this state. *Denver v. Trailkell,* 125 Colo. 488, 244 P. (2d) 281.

■ We are of the opinion that a manufacturer has no greater right in merchandise sold under a trade name than it would have in merchandise which was patented, copyrighted or sold under a registered trade-mark. A patentee receives the price demanded for an article on which he holds a patent. After the sale, however, the article passes beyond the limits of his patent monopoly. In the absence of a contract between the patentee and the purchaser of his product, the latter is free to sell the patented article for such price and upon such terms as he may select. No state statute may deprive him of his right to so deal with that which he has lawfully acquired and to which he has an unconditional title.

■ One of the contentions of plaintiff is that the non-signer clause of the act permits it to fix the resale price of goods manufactured by it, without guidance or standards as to reasonableness, or responsibility to anyone but itself. The General Assembly itself has no power to fix the prices of merchandise sold on the open market, it follows that it cannot lawfully delegate such authority to another, who may at his election, alter such resale

price according to his personal whim or caprice and for his own benefit. Except under the police power in a proper case, no right reposes in the General Assembly to fix prices at which an owner of property shall sell that which he owns and offers to sell. See *Smith Brothers Cleaners and Dyers, Inc. v. People, ex rel. Rogers,* 108 Colo. 449, 119 P. (2d) 623; *Wilson v. City and County of Denver,* 65 Colo. 484, 178 Pac. 17. In the Wilson case, which involved an act of the General Assembly concerning rates to be charged by an employment agency to clerical and technical employees we held the Act to be unconstitutional, and said: "The right to carry on a legitimate business is a property right, and it cannot be taken away or abridged by an exercise of the police power, unless it appears 'first, that the interests of the public generally, as distinguished from those of a particular class, require such interference, and second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.' *Lawton v. Steele,* 152 U.S. 133, 138 L. Ed. 388, 14 Sup. Ct. 490."

The case of *Smith Brothers Cleaners and Dyers, Inc. v. People,* supra, involved the validity of a statute permitting the Industrial Commission to fix minimum prices in the retail cleaning business. We there held that the cleaning business was one "affected with a public interest" but we also held the law invalid because the mode of fixing prices did not contemplate a proper hearing. There the prices were to be fixed by a public agency of the state. In the instant case we have an entirely different situation. Here a private manufacturer, motivated only by a desire to maximize its gains and stifle price competition, is permitted to fix prices. If the General Assembly cannot permit a State Agency to fix prices without hearing, it cannot delegate to private parties the power to fix prices for their own profit, without a hearing or standards, and without an agreement between the manufacturer and the seller.

174

Attention is directed to the recent case of *Perkins, Director of Revenue v. King Soopers, Inc.,* 122 Colo. 263, 221 P. (2d) 343. There it was claimed that King Soopers, Inc., sold certain merchandise below cost, with intent to injure its competitors under the Unfair Practices Act, C.R.S. '53, 55-2-3. The plaintiff contended that it was not necessary to prove intent. It was held, however, that intent had to be proved, otherwise the legislation would be a flat fixing of prices, without regard to the *public welfare.* In holding that the necessary proof of intent to injure was lacking, we said:

"Our study of the decided cases leads to the conclusion that a statute attempting to prohibit all sales below cost would be unconstitutional, and to avoid this result only such sales may be prohibited *which are intended to injure the public* in a manner warranting the exercise of the police power."

█ *Williams v. Standard Oil Co.,* 278 U.S. 235, held a statute of Tennessee which attempted to fix the price of gasoline unconstitutional. It was there said: "It is settled by recent decisions of this court that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with public interest.'" We have so held. *Smith Brothers v. People, supra.* The resale at retail of "Winchester" products hardly falls within that category.

The Georgia Milk Control Law attempted to fix a minimum price for the retail sale of milk. A board was provided to fix the minimum price. In *Harris v. Duncan,* 208 Ga. 561, 67 S.E. 2d 692, decided in 1951, the Georgia statute was declared unconstitutional. The court said: " * * * before the General Assembly can authorize price fixing without violating the due process clause of our Constitution, among other requirements, it must be done in a business or where property involved is 'affected

with a public interest' and the milk industry does not come within that scope."

In *New State Ice Co. v. Liebmann,* 285 U.S. 262, an Oklahoma statute, controlling the manufacture, sale and distribution of ice as a public business was held unconstitutional. There the court said: "It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor * * *. And this court has definitely said that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use."

Can it be said that the retail sale of Winchester arms or ammunition is different than the sale of milk, meat, bakery goods, shoes and other everyday essentials? We think not. This, notwithstanding that the plaintiff has a brand or trade-mark on its products.

"To let down the barriers of our Constitution and take away the right of contract by seller and purchaser as to milk, might well be applied to other food products. Once the constitutional barrier against infringement upon the right of free contract is down, and the gates become open to products because of their universal use by the public and its concern for a constant and adequate supply thereof, other products such as gasoline, oil, tobacco, clothing, and similar articles could well be the subject of price fixing." *Harris v. Duncan, supra.*

■ If it could be held that the legislature might lawfully delegate price fixing power under this act, still the law must fail because no standard or yardstick is provided by which such prices are to be determined. Any such delegation of power to be valid, must provide a primary standard or general rule, to be followed in discharging the delegated power. *Buttfield v. Stranahan,* 192 U.S. 470; *Red "C" Oil Mfg. Co. v. Board of Agriculture of North Carolina,* 222 U.S. 380; *Union Bridge Co. v. United States,* 204 U.S. 364; *Panama Refining Co. v.*

*Ryan,* 293 U.S. 388; *Schecter Poultry Corp. v. United States,* 295 U.S. 495.

The Colorado Fair Trade Act grants to private individuals the right to fix prices without providing a standard or fixing the limits within which such prices are to be regulated, and it leaves entirely to certain favored individuals the choice of whether minimum resale prices shall or shall not be fixed, a right which some of such individuals may choose to exercise, while others for reasons of their own may not.

We are inclined to the view that while a large segment of our people may use guns and ammunition, and while plaintiff may have a trade-mark on its product, which trade-mark protects plaintiff within the limits of the law under which it was issued, the retail sale of its products is not "affected with a public interest," and under the police power of this state the General Assembly may not fix prices and so may not confer the power on others to do so, thus taking from the seller and purchaser the right to agree upon a price of their choice, and interfering with their right to freely contract. The right to contract is a property right, protected by the due-process clause of the constitution and cannot be abridged by legislative enactment. The police power of the state exercisable by the General Assembly, while very broad, is exercisable only within the limits of the constitution. To sustain the price fixing power attempted by the General Assembly in the statute involved, under a claimed exercise of the police power, would be to place the power of the legislature above the constitution.

The inquiry here is whether the state statute comports with the freedom and security offered by the Colorado Constitution to the general principle of free trade. The device known as the fair trade principle employed in such statutes in the name of protection of the producer's trade-mark and purporting to benefit the public, is designed to serve the manufacturer's interest;

is for his own gain and hence an arbitrary and unreasonable regulation of the non-signer's business and a delegation of the legislative power in contravention of the constitution. Fair Trade laws, which have been given an exemption from anti-trust statutes to validate them, remain subject to constitutional requirements. The Colorado statute fixes no prices as to trade-marked commodities, but attempts to authorize vendors and vendees to fix prices. Under the Act every retailer of a particular commodity is brought into the picture, and if the Act did not make each of the contracting parties a judge of his own case, it attempts to make the vendor and vendee of one commodity the arbiters of the property rights of every stranger to the contract who owns or lawfully acquires commodities of the same brand or bearing the same trade-mark. A retailer, not guilty of any fraud or deception, who takes a smaller profit than another retailer is willing to accept for the same commodity, is not engaged in unfair competition. The contract in the instant case merely tends to stifle trade in plaintiff's commodity, and if enforced inevitably will result in monopoly. Carried to its logical conclusion this non-signer clause could be made to apply to edible commodities, canned goods, etc., the producers of which could cover the nation with agreements like the one in the instant case, thereby making a mockery out of the title to the Colorado Act, which declared it to be for the protection of the "public" as well as the owners of trademarks.

To the extent that the Colorado Act is coercive it is lacking in due process, is confiscatory, and tends to establish a monopoly. It may not be upheld on the ground that it is necessary for the protection of plaintiff's good will. Monopolistic prices injure good will, rather than enhance it. The average consumer of goods will find scant comfort in a situation which compels the public to pay a higher price for merchandise under the Fair-Trade law solely because a manufacturer has en-

tered into an agreement with one or more Colorado dealers fixing the price of his product, and by which all other dealers are bound, with the result that prices are forced upward.

The state of Louisiana enacted a Fair Trade Act substantially like the Colorado statute. In that state Schwegmann Brothers were merchants selling liquor at retail in Louisiana. Calvert Distributing Corporation was a wholesaler of liquor and had effected agreements with certain retailers in substantially the form of the one before us under the Colorado statute. Schwegmanns refused to sign such a contract and Calvert sought to enjoin them from selling below its "fair-trade price," even though they had not signed such an agreement. In the case of *Schwegmann v. Calvert Distributing Corporation,* supra, the "non-signer" provision of the Louisiana Act was declared to be void. The court said: "It is clear from our decisions under the Sherman Act \* \* \* that this interstate marketing arrangement would be illegal, that it would be enjoined, that it would draw civil and criminal penalties, and that no court would enforce it. Fixing minimum prices like other types of price fixing is illegal per se. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211. Retail price maintenance was indeed struck down in *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373. The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress." It was further said that the Miller-Tydings Act approved only contracts relating to the resale of goods and that the non-signer clause of the Louisiana Act was in violation of the Sherman Anti-trust Act. Considering the Miller-Tydings amendment to the Sherman Act, it was said: "If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy — hitherto illegal — is made

lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose. price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion." The court further said: "But when retailers are forced to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to voluntary engagements. Otherwise the exception swallows the proviso and destroys its practical effectiveness." In a word, the Miller-Tydings amendment to the Sherman Act by its language connotates 'a voluntary scheme.' Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing."

Following this decision *Calvert Distillers Corp. et al. v. Sachs,* 234 Minn. 303, 48 N.W. 2d 531, was decided. It holds that the non-signer provision of the Minnesota Fair Trade Law "is invalid and inoperative insofar as it purports to authorize the enforcement of minimum fair-trade resale prices against any person who is not a party to the contract by which the minimum resale prices were established with respect to commodities in interstate commerce."

*General Electric Company v. Wahle,* (Ore.) 296 P. (2d) 635, decided April 18, 1956, is one of the latest pronouncements on the matters involved in the instant case. In this case it appeared that some two hundred retailers in Oregon had entered into contracts with General Electric fixing resale prices pursuant to the Oregon Fair Trade Act. Wahle did not enter into such a contract, but had express notice of its existence and the minimum

180

prices thereby established. Wahle sold General Electric products at less than the minimum prices fixed in the contracts. General Electric sought to enjoin him from so doing. Its complaint was dismissed and the Supreme Court of Oregon affirmed the trial court's action, holding the Oregon act unconstitutional. We quote from the opinion:

"In substance, what is the real purpose of the Fair Trade Act? Regardless of how its true nature may be camouflaged by high-sounding terms such as 'free and open competition,' 'unfair competition,' 'protection of good will,' etc., it is a matter of common knowledge that it is a price-fixing statute designed principally to destroy competition at the retail level. Protection of the 'good will' of the trademark owner is simply an excuse and not a reason for the law. * * * The right to pursue any legitimate trade, occupation or business is a natural, essential, and inalienable right, and is protected by our constitution. * * * The right of an owner of property to fix the price at which he will sell it is an inherent attribute of the property itself and is within the protection of the state and federal constitutions. (Citing cases.) The enactment of the Fair Trade Act can be justified only upon the theory that it constitutes a reasonable and proper exercise of the inherent police power residing in the state. The police power is broad and far-reaching, and it is difficult, if not impossible to fix its bounds. Yet an exercise of the police power can never be justified unless it is reasonably necessary in the interests of the public order, health, safety and welfare. The legislature is not the final judge of the limitations of the police power, and, because the legislative action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon whether they can ultimately pass the judicial test of reasonableness. * * * Viewed from a realistic standpoint, it is difficult to find any justification for the Fair Trade Act based upon considerations of the public health, safety,

morals, and welfare. We can see no real and substantial connection between the nebulous theory that fixed minimum resale prices are necessary to protect the good will of the trademark owner and the welfare of the public. We agree with what the Supreme Court of Michigan said in *Shakespeare Co. v. Lippman's Tool Shop Sporting G. Co.*, 340 Mich. 109, 54 N.W. 2d 268. * * *

"In *Van Winkle v. Fred Meyer, Inc.*, 151 Ore. 455, 49 P. (2d) 1140, we held unconstitutional, as an attempt to make an unlawful delegation of legislative authority, a statute which empowered the governor to approve marketing agreements entered into by persons representing a substantial majority of the volume, measured in dollars or unit of output, of the intrastate business within this state of a particular industry or sub-division thereof, and declaring that the provisions of any agreement so approved should constitute the legal standards of fair competition and fair trade practices for the industry covered by the agreement. In discussing the statute, Mr. Justice Rand, in speaking for the court, said: ' * * * This leaves wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be. It is impossible to conceive of a more complete delegation of legislative power and, since the act contravenes the plain provisions of our constitution in that it attempts to make an unlawful and unauthorized delegation of legislative power, the act is unconstitutional and void.' * * *

"Under the Fair Trade Act authority is delegated to the owner of a trademarked commodity to determine whether the provisions of the law shall be put into effect and operation as to such commodity, just as authority was delegated to a majority of producers to fix prices under the statute involved in the *Van Winkle v. Meyer, Inc.* case * * *. By his own act in entering into a contract with a single retailer, the trade-mark owner may fix the price for all retailers. Without regard to the

interests or welfare of the non-signers, and without their consent, he may change the price at will, or even terminate the contract ending the operation of the statute as to his commodity. It is solely up to him to say whether his article of trade shall be sold. Could there possibly be a more flagrant violation of the constitutional provision respecting the delegation of legislative power than is attempted by the Fair Trade Act? We think not. See *Demers v. Peterson,* 197 Ore. 466, 254 P. (2d) 213. Under no circumstances is the legislature empowered to delegate to a private person for private benefit the power to fix minimum resale prices binding upon parties with whom he has no direct contractural relationship; *in some cases where the public health, safety, and welfare demands, it might perhaps lawfully delegate such power to a public administrative body, provided proper standards to guide and control the actions of such agency are provided in the law, but not otherwise."* (Emphasis supplied.)

Mr. Justice Lusk in his specially concurring opinion in this case, said: "It, therefore, appears that the Oregon Fair Trade Act has attempted to vest in a distributor in combination with one or more retailers the authority to fix the resale price of certain commodities. The fact that the commodities are identified by a trade-mark, brand, or the name of the owner or distributor, is irrelevant to the present question. *It is none the less price fixing, determined not by the legislature itself, not by a board or commission acting under legislative authority, but by private individuals."* (Emphasis supplied.)

In *Union Carbide and Carbon Corp. v. White River Distributors, Inc.,* 224 Ark. 558, 275 S.W. 2d 455, it was said:

"The right of appellee [non-signer] to sell its own property at a price agreeable to it is a right guaranteed by the Constitution since it is a valuable property right. That such right to sell is a valuable property right cannot be denied. * * *

"Nobody doubts the feasibility of appellent acquiring one contract dealer out of the hundreds of retail dealers in the state, or the feasibility of bringing this information to all other dealers. If securing a contract with one dealer binds all others, then the corollary would be that, absent such contract, the others are not bound. It is frightful to think a device so easily concocted could destroy the constitutional bulwark protecting our personal liberties and the public welfare. * * *

"Full and free competition is the long recognized basis of our economy. * * * we believe it is generally recognized that the interest of the public is best served by the opportunity to buy commodities in a freely competitive market. * * * The Act can be sustained only if it enhances the general welfare and not if it restricts it to only a small extent."

The Arkansas Act was held to be unconstitutional.

See, also, *McGraw Electric Co. v. Lewis & Smith Drug Co. Inc.*, 159 Neb. 703, 68 N.W. 2d 608, and *Dr. G. H. Tichenor Antiseptic Company v. Schwegmann Brothers Giant Super Markets, et al.* (La.) Decided June 29, 1956.

■■■ The non-signer provision of the Colorado Fair Trade Act is a price-fixing measure, and by the very terms of the enactment is an unlawful delegation of power to a manufacturer or producer to fix a minimum price binding on all who acquire and sell his product. This attempted delegation of power will not be allowed to stand when it vests in private persons the right to determine the time and conditions upon which the effect of the law depends.

Referring again to the *Liquor Store, Inc.*, supra, case, we quote: "Our conclusion is that the act is arbitrary and unreasonable and violates the right to own and enjoy property; one economic group may not have the sovereign power of the state extended to it and use it to the detriment of other citizens. In that case legislation serves a private rather than a public purpose. The sovereign power must not be delegated to a private citizen to be

used for a private purpose and especially where there is no state supervision."

Following this decision the Florida legislature passed a new act. This act was held invalid in 1954 in the case of *Miles Laboratories, Inc. v. Eckerd, et al.* (Fla.), 73 S. 2d 680. There the Supreme Court of Florida held that the non-signer clause of the Florida act was void as a violation of the police power, being a use of that power for a private and not a public purpose.

Chief Justice Terrell writing the opinion in *Miles Laboratories, Inc.,* supra, said: "It is hardly necessary to point out that the decisions of this court interpreting the Constitution of Florida are supreme and will not be overthrown by act of Congress or the Federal Courts unless some Federal constitutional question is involved." He further said: "Neither Chapter 541, Florida Statutes, 1951, nor the McGuire Act of Congress, changes the picture."

The Michigan court has so held in at least two cases. In October, 1955, the case of *Argus Cameras, Inc. v. Hall of Distributors, Inc.,* 343 Mich. 54, 72 N.W. 2d 152, was decided. It was there held that under the Fair Trade Law, defendants as non-signers of so-called fair trade agreements with manufacturer of cameras, etc., could not be enjoined from purchasing the products of the manufacturer from signers of fair trade agreements, nor from selling the products at prices less than the prices fixed by the manufacturer. The same ruling was made in the Shakespeare case, supra.

Defendant here was not guilty of fraud or deception in acquiring the merchandise he retailed and he is not engaged in "price-cutting" as that term is generally understood, or defined in the Unfair Practices Act, but is apparently making a satisfactory profit on each sale made by him. If the statute here involved be enforced, defendant will be required to increase the price of the articles sold by him to the consuming public, arbitrarily and against his will. The impact of this legislation is a

telling blow on the mass of people who constitute the consuming public. To retailers it means elimination of price competition and more profits; to the consumer it means the loss of the benefits arising from wholesome price competition, and is productive of still higher cost of living. The defendant is merely selling commodities manufactured by plaintiff at prices lower than those agreed upon by plaintiff and one Colorado retailer. This contracting retailer voluntarily entered into the stipulation and contract, Exhibit "B," which either party may voluntarily abandon upon ten days notice, thus in effect repealing the statute in much less time than the General Assembly could accomplish that result.

Defendant for aught that appears from this record purchased the manufactured products of plaintiff from recognized dealers in plaintiff's merchandise, or direct from plaintiff. No condition was attached to defendant's purchase. Plaintiff should not now be heard in a court of equity to insist that defendant deal with such commodities lawfully acquired, on a restricted basis or to assert that such articles were acquired conditionally.

Under the non-signer clause of this Act, A by contracting with B can compel C and D to sell A's goods at prices agreeable to A and B, but not agreeable to C and D. Hence, A and B seek to achieve by the mandate of this statute what they cannot achieve by contract with C and D, because the latter are unwilling to enter into such negotiations respecting the property which they own. The effect is that the manufacturer A seeks to extend his ownership of commodities produced by him after he has sold them in the normal channels of trade and commerce, and the inevitable result, as attempted by the General Assembly, is that the purchaser loses the right to sell his goods bought for resale at prices of his own choosing. The right to fix the price at which one will sell his property is in itself a well recognized property right. *Tyson & Brother United Theatre Ticket Of-*

*fices v. Banton,* 273 U.S. 418; *Chas. Wolff Packing Co. v. Court of Industrial Relations,* 262 U.S. 522.

 The General Assembly may validate resale price maintenance contracts as between contracting parties within constitutional limits, but when the effect of the Act, as in the instant case, is to make such price schedule binding upon non-contracting parties, the Act is nothing more or less than price fixing by legislative mandate. An unwilling citizen cannot be thus bound.

 Any act of the General Assembly which arbitrarily destroys or impairs the right of the individual to the free use and enjoyment of his property, lawfully acquired, and permits the fixing of prices for the benefit of a special group, is opposed to the constitutional concept of a free people and should not be allowed to stand. Legislation of this kind evidences the ability of organized minorities to induce legislation for their special benefit at the expense of the unorganized purchasing masses. During a recent decade numerous attempts were made to regiment the general public and in each instance they were struck down as violative of constitutional rights of a free people. We have not yet arrived at the place in America where the many must yield to the few, so that the latter may make ever increasing profits at the expense of those who still believe in the principle of free and competitive trade and commerce, untrammeled by legislative fiats.

 The Colorado Fair Trade Act does not necessarily apply to all trade-mark owners, producers and distributors. It becomes operative only as to those who elect and attempt to bind non-contracting retailers dealing in the same commodities. What today may be invalid as restraint of trade, may under our Act at the whim of the manufacturer be perfectly lawful next week. What we are saying is that such restraint of trade and destruction of price competition may thus vary from time to time at the will of the manufacturer or distributor. The Act is primarily and essentially a

price fixing statute, and unless authorized under the police power, offends against the constitution. The defendant has not obligated himself to fix resale prices at the stipulated minimum by virtue of any contract he has entered into. He is compelled to do so by the terms of this Act. We must look not to the statute, but to the contract between plaintiff and Fisher to determine the minimum price, below which the defendant shall not sell.

In the recent case of *United States of America v. McKesson and Robbins, Inc.* (U.S. Supreme Court, June 11, 1956), Chief Justice Warren stated: " * * * resale price maintenance is a privilege restrictive of a free economy." Citing *United States v. Masonite Corp.,* 316 U.S. 265, 280.

We are not here concerned with the Federal antitrust acts or amendments thereto, but with the fundamental and basic right of our citizens under the constitution to deal with their property, lawfully acquired, as they see fit when such transactions do not violate any statute passed pursuant to a valid exercise of the police power for the protection of the public.

The judgment of the trial court is affirmed.