REMINGTON ARMS COMPANY, INC. v. G. E. M. OF ST. LOUIS, INC., AND ANOTHER.
MILES LORD, ATTORNEY GENERAL, INTERVENOR.

102 N. W. (2d) 528.

April 8, 1960—No. 37,969.

*Maslon, Kaplan, Edelman, Joseph & Borman,* for appellants.

*Cant, Taylor, Haverstock, Beardsley & Gray, Robert F. Henson, Lawrence E. Nerheim,* and *James S. Simonson,* for plaintiff respondent.

*Miles Lord,* Attorney General, and *Walter F. Mondale,* Special Assistant Attorney General, for intervenor respondent.

*Theodor Herman,* for Bristol-Myers, Inc., amicus curiae.

564

*Larson, Loevinger, Lindquist & Fraser, Gerald E. Magnuson,* and *Eugene H. Keating,* for Minnesota Council of Retail Trade Associations, amicus curiae.

MURPHY, JUSTICE.

This is an appeal from a judgment of the District Court of Hennepin County restraining the defendants, G. E. M. of St. Louis, Inc., a superdepartment store, hereinafter referred to as G. E. M., and Playtime Sporting Goods, Inc., its lessee and licensee, hereinafter called Playtime, from selling or offering for sale certain trade-mark commodities of the plaintiff, Remington Arms Company, Inc., at prices below "established" fair trade minimum prices. We are asked to pass upon the constitutionality of L. 1937, c. 117 (M. S. A. 325.08 to 325.14), sometimes referred to as the Fair Trade Act, Retail Price Maintenance Law, or Nonsigner Act.

There is no dispute as to the facts. The plaintiff manufactures and distributes, under the registered trade-mark "Remington," sporting firearms and loaded ammunition. It has an agreement with two Minnesota retailers stipulating the minimum retail price of its products. It has no contract with the defendants with respect to the sale of its commodities or the minimum resale prices thereof. By virtue of § 325.12 plaintiff maintains that the prices stipulated by its contracts were binding on the defendants, who had notice thereof, regardless of whether the defendants were parties to such contracts and that the defendants could not lawfully sell such commodities at any price below the prices so fixed by the plaintiff. Playtime is a sporting goods store and one of a number of operators doing business under a percentage license granted by G. E. M. on premises leased from the latter company. G. E. M. caters to government employees and employees of companies who have contracts with the government. Its method of operation is geared to a high-volume, lower-selling-price basis with the idea of passing on to its customers the benefit of lower net costs of doing business, which it says result from its method of operation.

The so-called Fair Trade Act in so far as it is applicable here provides (§ 325.08):

"No contract relating to the sale or re-sale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity, and which commodity is in free and open competition with commodities of the same general class produced or distributed by others, shall be deemed in violation of any law of the state by reason of any of the following provisions which may be contained in such contract:

"(1)  That the buyer will not resell such commodity at less than the minimum price stipulated by the seller; * * *."

This provision permits the vendor-manufacturer or distributor and the vendee-retailer or wholesaler to vertically agree to fix the price of a commodity, providing the agreement satisfies the conditions of the act. But the act goes further. At the heart of the Fair Trade Act is the so-called "nonsigner" provision. Section 325.12 states that:

"Wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of sections 325.08 to 325.13, whether the person so advertising, offering for sale, or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

This provision requires all persons who have notice of any agreement made pursuant to the act and the prices called for thereunder to abide by the prices whether or not they have entered into such an agreement. Because the nonsigner clause effectively establishes the resale price in this manner, regardless of whether consent is obtained from the seller, the act is said to be unconstitutional.

The plaintiff relies on McElhone v. Geror, 207 Minn. 580, 292 N. W. 414, and Old Dearborn Distributing Co. v. Seagram-Distillers Corp. 299 U. S. 183, 57 S. Ct. 139, 81 L. ed. 109. We cannot agree that the McElhone case controls the issue before us. That case dealt with the Unfair Practices Act which relates to sales below cost for the purpose or with the effect of destroying competition. The court there had before it L. 1939, c. 403. That act which is clearly aimed at suppressing predatory trade practices denounces sales of commodities

below cost (§ 325.04) "for the purpose or with the effect of injuring a competitor or destroying competition" where the effect of the lower prices "may be substantially to lessen competition or tend to create a monopoly in any line of business, or to injure, destroy, or prevent competition * * *." The Unfair Practices Act construed in the Mc-Elhone case dealt only with sales below cost for the purpose or with the effect of destroying competition. We held that the restrictions imposed by the act were designed to protect public interest and that it was an appropriate exercise of police power designed specifically to meet a specific evil. There is this significant distinction between that act and the one before us: The act with which we are concerned (§§ 325.08 to 325.14) undertakes to make lawful, contracts which were unlawful prior to its passage. See, § 623.01, Minnesota Antitrust Law. It applies to commodities sold under a trade-mark, name, or brand which are in free and open competition with commodities of the same general class produced or distributed by others. It exempts from antitrust laws and authorizes contracts for sale or resale of such commodities, pursuant to which the buyer undertakes that he will not resell at less than the price stipulated by the seller and that the buyer, in turn, will require any dealer to whom he sells to agree not to resell at less than the price stipulated by the original seller. Thereby producers or distributors are able to fix not only their own selling price but also the wholesale and retail price to be charged in subsequent transactions. The Unfair Practices Act (§ 325.04) is designed to protect the public from predatory or below-cost trade practices. On the other hand, under the apparent purpose of protecting the goodwill of the manufacturer of the brand commodity, the nonsigner provision (§ 325.12), in reality, eliminates competition in price honestly based on differences in selling costs as between merchants whose costs of business may differ as a result of normal and natural competitive practices. "[The latter] type of competition is to be encouraged in the public interest, rather than restrained." Great Atlantic & Pacific Tea Co. v. Ervin (D. Minn.) 23 F. Supp. 70, 78.

It is unnecessary to discuss the history of fair trade legislation in Congress and the courts. It is sufficient to say that within a few years

after the enactment of the Miller-Tydings Act, 15 USCA, § 1, in 1937 legislatures of 45 states and the territory of Hawaii had enacted fair trade legislation. The Illinois act was held to be constitutional in Old Dearborn Distributing Co. v. Seagram-Distillers Corp. 299 U. S. 183, 57 S. Ct. 139, 81 L. ed. 109. Subsequently the United States Supreme Court in Schwegmann Brothers v. Calvert Distillers Corp. 341 U. S. 384, 388, 71 S. Ct. 745, 747, 95 L. ed. 1035, 1045, held that enforcement of the price arrangement against a nonsigner violated the Sherman Act, since only voluntary minimum price arrangements were excepted therefrom by the Miller-Tydings Act.[1] The court there expressed this view of the Nonsigner Act:

"* * * If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion."

Thereafter Congress enacted the McGuire Act of 1952, 15 USCA, § 45, which approved the subjection of nonsigners to price-fixing agreements in interstate commerce where such restrictions are imposed by state law.[2] A great body of decisional law has grown out of litigation testing the constitutionality of state fair trade acts. Annotations, 60 A. L. R. (2d) 422 and 104 A. L. R. 1452. Much has been written and reported by legal scholars and economists who have examined the subject. The most recent decision is from the Supreme Court of Washington, Remington Arms Co. Inc. v. Skaggs, 55 Wash. (2d)

---

[1] Calvert Distillers Corp. v. Sachs, 234 Minn. 303, 48 N. W. (2d) 531.

[2] This act was upheld in Schwegmann Brothers Giant Super Markets v. Eli Lilly & Co. (5 Cir.) 205 F. (2d) 788, certiorari denied, 346 U. S. 856, 74 S. Ct. 71, 98 L. ed. 369.

1, 345 P. (2d) 1085, by which that court in overruling its former holding in Sears v. Western Thrift Stores of Olympia, Inc. 10 Wash. (2d) 372, 116 P. (2d) 756, held that the nonsigner clause of the Fair Trade Act is invalid as an improper exercise of police power.

In spite of the decision of the United States Supreme Court in the Old Dearborn case, a growing number of state courts have invalidated these acts in interpreting challenges made under their own constitutions.

A number of theories have been used to support these decisions. Aside from those states which have peculiar constitutional provisions thought to require invalidation of the acts, the theories most used are (1) that they violate due process of law;[3] (2) that they deny equal protection of the laws;[4] and (3) that they unlawfully delegate legislative power.[5] However, about half of the states which have considered

---

[3]Union Carbide & Carbon Corp. v. White River Distributors, Inc. 224 Ark. 558, 275 S. W. (2d) 455; Olin Mathieson Chemical Corp. v. Francis, 134 Colo. 160, 301 P. (2d) 139; Cox v. General Elec. Co. 211 Ga. 286, 85 S. E. (2d) 514; Bissell Carpet Sweeper Co. v. Shane Co. Inc. 237 Ind. 188, 143 N. E. (2d) 415; General Elec. Co. v. American Buyers Co-op. Inc. (Ky.) 316 S. W. (2d) 354; Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Brothers Giant Super Markets, 231 La. 51, 90 So. (2d) 343, 60 A. L. R. (2d) 410; Shakespeare Co. v. Lippman's Tool Shop Sporting Goods Co. 334 Mich. 109, 54 N. W. (2d) 268; McGraw Elec. Co. v. Lewis & Smith Drug Co. Inc. 159 Neb. 703, 68 N. W. (2d) 608; Skaggs Drug Center v. General Elec. Co. 63 N. M. 215, 315 P. (2d) 967; General Elec. Co. v. Wahle, 207 Ore. 302, 296 P. (2d) 635; Rogers-Kent, Inc. v. General Elec. Co. 231 S. C. 636, 99 S. E. (2d) 665; General Elec. Co. v. A. Dandy Appliance Co. Inc. 143 W. Va. 491, 103 S. E. (2d) 310; cf. Union Carbide & Carbon Corp. v. Bargain Fair, Inc. 167 Ohio St. 182, 147 N. E. (2d) 481.

[4]McGraw Elec. Co. v. Lewis & Smith Drug Co. 159 Neb. 703, 68 N. W. (2d) 608; General Elec. Co. v. Wahle, 207 Ore. 302, 296 P. (2d) 635.

[5]Olin Mathieson Chemical Corp. v. Francis, 134 Colo. 160, 301 P. (2d) 139; Bissell Carpet Sweeper Co. v. Shane Co. Inc. 237 Ind. 188, 143 N. E. (2d) 415; Quality Oil Co. v. E. I. du Pont de Nemours & Co. 182 Kan. 488, 322 P. (2d) 731; Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Brothers Giant Super Markets, 231 La. 51, 90 So. (2d) 343, 60 A. L. R. (2d) 410; McGraw Elec. Co. v. Lewis & Smith Drug Co. Inc. 159 Neb.

the question have sustained the acts against all three contentions.[6]

Having considered the authorities, we find it unnecessary to determine whether this statute violates due process or denies equal protection of the laws of this state. We have concluded and so hold that the nonsigner provision of the Fair Trade Act is an unlawful delegation of legislative power.

With respect to the defendants' contention that the nonsigner provision constitutes an unconstitutional delegation of power, plaintiff asserts that "there is no delegation involved here; and that, in any event, even if there were, it would be a valid delegation because of the existence of adequate standards whereby the alleged delegate's actions are sufficiently controlled and guided." It particularly relies on Joseph Triner Corp. v. McNeil, 363 Ill. 559, 2 N. E. (2d) 929, 104 A. L. R. 1435; Weco Products Co. v. Reed Drug Co. 225 Wis. 474, 274 N. W. 426; Scovill Mfg. Co. v. Skaggs Pay Less Drug Stores, 45 Cal. (2d) 881, 291 P. (2d) 936. The rationale of these decisions is that the statute is complete and final when passed and that the acts of the parties in making specific contracts which make the law operative are not an exercise of delegated legislative power. The underlying distinction between the delegation of power to make a law and the discretion to give effect to a viable law seems to be first stated in the early case of Cincinnati, W. & Z. R. Co. v. Commrs. of Clinton County, 1 Ohio St. 77, 88, where it was said:

"* * * The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

In considering the application of the authorities submitted by

---

703, 68 N. W. (2d) 608; Remington Arms Co. Inc. v. Skaggs, 55 Wash. (2d) 1, 345 P. (2d) 1085.

[6]The states are Arizona, California, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Dakota, Tennessee, and Wisconsin.

the plaintiff it is necessary to keep in mind that under Minn. Const. art. 3, § 1, and art. 4, § 1, the legislative power is vested in the Senate and the House of Representatives. It is recognized by all courts that the legislature may authorize others to do things which it might properly, but cannot conveniently or advantageously, do itself. 3 Dunnell, Dig. (3 ed.) § 1597. In State v. McMasters, 204 Minn. 438, 283 N. W. 767, it was held that the ascertainment of facts and the fixing of a minimum price for barbers' services based thereon imposed upon the governor or upon a board or commission is not an unlawful delegation of legislative powers. The distinction between *delegating a power* and *conferring authority or direction as to its execution* has been considered by this court in previous decisions. We have never understood that the legislature may enact an open-end type of regulation which will give to a private party the arbitrary right to exercise an option to make a law operative on his own terms. In Williams v. Evans, 139 Minn. 32, 41, 165 N. W. 495, 497, 166 N. W. 504, L. R. A. 1918F, 542, 545, we pointed out:

"* * * If, by the terms of the act, it is to be effective only in case a commission deems the act expedient, then there is a delegation of legislative power and the act is void, for a determination of legislative expediency can be made by the legislature alone."

In Lee v. Delmont, 228 Minn. 101, 113, 36 N. W. (2d) 530, 538, we said:

"* * * Pure legislative power, which can never be delegated, is the authority to make a complete law—complete as to the time it shall take effect and as to whom it shall apply—and to determine the expediency of its enactment. Although discretion to determine when and upon whom a law shall take effect may not be delegated, the legislature may confer upon a board or commission a discretionary power to ascertain, *under and pursuant to the law,* some fact or circumstance upon which the law by its own terms makes, or intends to make, its own action depend. The power to ascertain facts, which automatically brings a law into operation by virtue of its own terms, is not the power to pass, modify, or annul a law. If the law furnishes a reasonably

clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies, so that the law takes effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers, the discretionary power delegated to the board or commission is not legislative."

In discussing the subject of whether the power to fix prices for sales of goods or services binding upon all parties whether or not they consent is a legislative power, the Supreme Court of Kansas, in discussing the Fair Trade Act in Quality Oil Co. v. E. I. du Pont de Nemours & Co. 182 Kan. 488, 496, 322 P. (2d) 731, 737, said:

"* * * The fixing of minimum prices is the exercise of legislative power since it prescribes a rule governing conduct for the future which is binding upon those who do not consent."

In examining the grant of authority to the trade-mark owner it must be conceded that he is given the privilege to place the law in effect and to amend or alter it at his will. He may do this without regard to the interest or welfare of nonsigners or the consumer who represents the public. The law does not provide for any standard or condition as to the necessity for the act. It gives to the trade-mark owner carte blanche authority to make that determination alone. He is not required to consult with anyone. There is no one to review his act.

In considering the justification for reposing this authority in the trade-mark owner, the real character and purpose of the Fair Trade Act should be examined. Its ostensible justification is to compel adherence to fixed prices so as to protect against debasement the goodwill of trade-name commodities. Although this property right may be constitutionally protected, as witness the Old Dearborn decision, an examination of the great number of authorities and the vast literature by way of reviews and reports dealing with the subject compels the conclusion that the real impact of the law is in the area of price fixing.

If we realistically appraise the act for what it is, it should be recognized as a selective price control act which leaves to the manufac-

turers of trade-mark products the arbitrary right to determine if and when it shall take effect. No standard or yardstick is provided by which such prices are to be determined. It grants to a private party the privilege of creating a right of action for its own benefit or suspending that right at its will. No hearing is provided for to safeguard or protect the unwilling retailer or the consumer.

Thus by virtue of the nonsigner clause the private party in effect may regulate prices as it sees fit. Since one manufacturer and one retailer may fix prices for all retailers, they have the complete power to fix prices regardless of anyone's interest but their own. Those authorities which hold that this is not an unlawful delegation to private parties seem to us to be unsound. In 1 Davis, Administrative Law Treatise, § 2.14, p. 145, it is stated:

"* * * A non-signer provision of such a law provides that a minimum resale price fixed in an agreement between a manufacturer (or other distributor) and a retailer is binding upon other retailers. *The effect is that parties to such an agreement have the legislative power to fix the minimum resale price at which non-parties may sell;* any seller who sells at a price lower than the price fixed in such an agreement is subject to suit by any person damaged." (Italics supplied.)

The same authority has pointed out that while some delegations to private parties should be valid (p. 147):[7]

"* * * The question is one of judgment as to whether the courts should allow the legislative bodies to govern in this manner, or whether vague constitutional provisions should be interpreted to prevent vesting this kind of power in private parties. That question must be considered in the context of the broad policies for and against the so-called fair trade legislation, and it must also be considered in the context of the variety of views about the fundamentals of the proper role of the judiciary in preventing what the judges deem to be bad government. * * * [D]espite the room for wide difference of opinion about such problems, almost any observer is likely to find it somewhat queer that the same court can hold (1) that a statute requiring an approval of a

---

[7]This subject is dealt with in 16 C. J. S., Constitutional Law, § 137.

designated proportion of adjoining property owners for a zoning variance is unconstitutional as a delegation to private parties, but that (2) a single distributor and a single retailer may constitutionally, without hearing or other safeguards, determine the minimum prices that a thousand or more nonconsenting retailers may charge."[8]

Since in the case before us it is not only the unwilling retailer but the consumer whose interests are at stake, we feel that the necessity for the law should be examined. We find nowhere in the record, or in the great volume of material submitted to us, persuasive considerations of public welfare or economic need which would require that hearing and other safeguards should be sacrificed to correct the evil the legislature seeks to remedy.

We are familiar with the reasons for fair trade acts and recognize that a difference of opinion exists as to whether or not they are economically sound.[9] The record in this case contains the testimony of a respected economist to the effect that resale price maintenance under the so-called Fair Trade Act is detrimental both to the consumer and to the economy. He was of the view that the producer of the commodity who invokes the act is usually a member of a monopoly or oligopoly, because if there were numerous producers of a competing commodity few would abide by the pricing practices of one or two. His opinion that the policy of the act makes possible a price monopoly inimical to the public welfare is clearly borne out by the record. There is in force a fair trade contract in respect to Remington shells produced by plaintiff. The major competing shells are manufactured by Olin Mathieson Chemical Corporation under the name of "Winchester." Olin Mathieson's shells are also fair traded. These two manu-

---

[8]In connection with the above observation it should be noted that this court has recently in State ex rel. Foster v. City of Minneapolis, 255 Minn. 249, 97 N. W. (2d) 273, held that a statutory provision conditioning municipal rezoning upon consent of the owners of two-thirds of property within a particular area was invalid as an unlawful delegation of power.

[9]See, Breighner, *Why Fair Trade is Fair,* 34 Mich. St. B. J. 40; Adams, *Resale Price Maintenance: Fact and Fancy,* 64 Yale L. J. 967; cf. Herman, *A Note on Fair Trade,* 65 Yale L. J. 23.

facturers control 87 to 90 percent of the production of shells in the United States. It appears from the record that for almost all types of shells produced by each of these manufacturers, in fact for every type which is common to the production of both of them, the price is identical to the penny. This is significant considering that the elaborate price lists of both manufacturers were printed and published 3 days apart. It is apparent that the record here establishes that the act, rather than regulating and controlling monopoly power, creates a climate where monopolies may flourish. These views are in accord with the thought of authorities who have written and reported on the subject of retail price maintenance in the past few years.[10]

■ Aside from the arguments pro and con as to the economic merits of the legislation, we are convinced that the reasons advanced for the grant of price-fixing power are not so compelling that we are forced to concede that the interests of the consumer are of so little importance that hearing and other safeguards may be dispensed with. Courts must view with grave concern the exercise of arbitrary power left in the hands of unofficial persons. Granting legislative power to private persons without hearing or other safeguards is a practice to be indulged in only when it appears that the end the legislature seeks can be accomplished in no other practicable way. This is especially so when, as here, the grant is given to the very persons who will benefit most by an arbitrary and wrongful use of that power. In Carter v. Carter Coal Co. 298 U. S. 238, 311, 56 S. Ct. 855, 873, 80 L. ed. 1160, 1189,

---

[10]Report of Attorney General's National Committee to Study the Antitrust Laws, 1955, pp. 149 to 154; Investigation of Concentration of Economic Power, 1941, p. 33; Report of Federal Trade Commission on Resale Price Maintenance, 1945, Summary and Conclusions, pp. LX to LXIV; Hearings on Resale Price Maintenance before Antitrust Subcommittee of House Judiciary Committee, 1952, p. 18; Bates, *Constitutionality of State Fair Trade Acts,* 32 Ind. L. J. 127; Bowman, *The Prerequisites and Effects of Resale Price Maintenance,* 22 U. of Chicago L. Rev. 825; Fulda, *Resale Price Maintenance,* 21 U. of Chicago L. Rev. 175; Herman, *A Note on Fair Trade,* 65 Yale L. J. 23; comments, 19 Ohio St. L. J. 748 and 34 Ore. L. Rev. 128; Kohrs, *Fair Trade and the State Constitutions—A New Trend,* 10 Vanderbilt L. Rev. 415; comment, 61 Yale L. J. 381.

the court, in discussing the grant to coal producers and unions of the power to fix maximum hours and minimum wages under the Bituminous Coal Conservation Act, said:

"The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. * * * [I]n the very nature of things, one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property."

It is true that some manufacturers and retailers have been operating under resale price maintenance agreements in this state for 22 years, but that fact cannot sustain the act if in considering all the circumstances it is not constitutionally sound. We feel that no reasons have been shown which compel this grant of power to private persons at the sacrifice of safeguards to both the unwilling retailers and the general public.

■ The plaintiff further contends that under the authority of State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 186 N. W. 694, 189 N. W. 592, the act provides for a lawful delegation of power. That case dealt with a statute under which the inhabitants of contiguous territory not organized as a city and having a certain population could incorporate as a city under certain conditions. Certainly the legislature may enact local option laws relating to subdivisions of government, which may be operative in the future and which contain provisions which might be necessary or desirable in the public interest with changing times and conditions. When such governmental units properly invoke such laws they act upon the conditions contemplated by the legislature and in so doing they are clearly exercising a discretion as to the execution of the law. For reasons already pointed out this type of legislation is clearly distinguishable from the Fair Trade

Act. See, Independent School Dist. No. 35 v. Borgen, 187 Minn. 539, 246 N. W. 119; Schmidt v. Gould, 172 Minn. 179, 215 N. W. 215; State ex rel. Tracy v. Cooley, 65 Minn. 406, 68 N. W. 66; State ex rel. Roche v. Rogers, 97 Minn. 322, 106 N. W. 345; contra, Stevens v. Village of Nashwauk, 161 Minn. 20, 200 N. W. 927; 17 Dunnell, Dig. (3 ed.) § 8903; 82 C. J. S., Statutes, § 402; 16 C. J. S., Constitutional Law, § 141.

Reversed.

MR. JUSTICE LOEVINGER, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.