315 P.2d 967

SKAGGS DRUG CENTER, a Corporation, Plaintiff-Appellant,

v.

GENERAL ELECTRIC COMPANY, a Corporation, Defendant-Appellee.

MILES LABORATORIES, Inc., Plaintiff-Appellee,

v.

SKAGGS DRUG CENTER, a Corporation, Defendant-Appellant.

No. 6204.

Supreme Court of New Mexico.
Sept. 27, 1957.

W. A. Keleher, John B. Tittmann, and T. B. Keleher, Albuquerque, for appellant.

Simms, Modrall, Seymour, Sperling & Roehl, and George T. Harris, Jr., Albuquerque, for General Elect. Co.

Rodey, Dickason, Sloan, Mims & Akin, Albuquerque, Cawley & Byron, Elkhart, Ind., for Miles Laboratories, Inc.

CARMODY, District Judge.

This case involves the questioned constitutionality of the New Mexico Fair Trade Act, being Chapter 44 of the Session Laws of 1937, which now appears as section 49-2-1 et seq., N.M.S.A., 1953. Actually, there are two consolidated cases which were consolidated by the court below and heard as one appeal in this court.

Originally the Skaggs Drug Center as plaintiff brought suit in Bernalillo County against the General Electric Company, seeking a declaratory judgment with respect to the Fair Trade Act. The General Electric Company answered and by way of counterclaim sought an injunction against Skaggs Drug Center to prevent it from further sales of General Electric fair traded products at a price below that fixed by the General Electric Company. At about the

same time Miles Laboratories, Inc., brought suit against Skaggs Drug Center, seeking an injunction to prevent Skaggs from selling Alka Seltzer and One-A-Day vitamin tablets at a price less than those established by Miles Laboratories. The two cases were consolidated for the purpose of argument, the facts having been stipulated to, and the lower court found the Fair Trade Act to be constitutional and entered injunctions on behalf of both General Electric and Miles Laboratories as against Skaggs Drug Center. It was stipulated below that both General Electric and Miles Laboratories had engaged in extensive national and local advertising and had built up and established a valuable goodwill in their respective trade-marked products, that the products are in fair and open competition in the state of New Mexico with commodities of the same general class manufactured and sold by others, that Skaggs had sold products of both of the corporations at less than the retail prices fixed by them with knowledge of the existing so-called fair trade agreement and the prices fixed thereby, and that Skaggs had advertised in the local newspapers in Albuquerque extensively, calling to the public's attention the fact that the products are available at certain prices which are less than established minimum retail prices.

For the purpose of this opinion, Skaggs Drug Center will be referred to as appellant and both General Electric Company and Miles Laboratories, Inc., will be referred to jointly as appellee.

A brief background of the fair trade acts is necessary in order to give a clear understanding of the situation which now faces the court. In the early days of the 1930 depression the state of California passed the first fair trade act. The purpose of the California act, and the others passed subsequently, was to "protect trade-mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade-mark, brand or name", Cal.Stat.1931, c. 278, p. 583.[1] The basic theory of this legislation was that there would be injury to the producer in cut-rate sales of his trade-marked goods where the consumer would associate a reduced price with a cheapening of brand quality, or where a distributor, in an effort to attract customers into his store at little or no profit, forces other distributors to match the price reduction and thereby makes it unprofitable for other distributors to carry the other trade-marked brand. The California act as finally amended was sustained by the Supreme Court of California in the frequently cited case of Max Factor and Company v. Kunsman, 5 Cal.2d 446, 466, 55 P.2d 177, affirmed 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122, and it should be noted that a great many of the sub-

1. Now West's Ann.Bus. & Prof.Code, § 16900 et seq.

sequent cases from other jurisdictions which sustain the fair trade laws adopt the language of the above case to a very large extent.

Subsequent to the original California enactment and principally during the depression years, most of the other states in the Union adopted a similar or identical law, until at the present time 45 states have enacted this type of legislation, only Texas, Missouri, and Vermont having resisted such an enactment, by reason of constitutional provision or otherwise. It is of interest to note that the so-called fair trade acts have been before the highest appellate courts of 27 states, and in 16 of the states the legislation has been sustained as constitutional, and in 11 as unconstitutional; however, these figures by themselves are almost meaningless because of the varying constitutional provisions in the different states and also by reason of the fact that the various courts have ruled either favorably or unfavorably, as the case may be, on widely differing theories. In addition to state decisions, the Supreme Court of the United States has been called upon on several occasions to rule upon these laws and the principal case relied upon by the proponents of the laws is the Old Dearborn Distributing Company vs. Seagram-Distillers Corporation, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109. This was an opinion by Mr. Justice Sutherland, which was the unanimous opinion of the court. Basically, the court's decision in this case is that the ownership of a trade-mark and goodwill constitutes property in a real sense, and injury to which, as with other species of property, is subject to litigation; that price cutting by retail dealers is injurious to the goodwill and business of the producer and distributor and injurious to the general public as well. It is interesting to note that the New York Court of Appeals which originally held the fair trade acts unconstitutional, Doubleday, Doran & Co. v. R. H. Macey & Co., 269 N.Y. 272, 199 N.E. 409, 103 A.L.R. 1325, one year later, following the Old Dearborn decision, supra, ruled the fair trade laws constitutional in a very short opinion, Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30, 110 A.L.R. 1411, in effect merely adopting the ruling of the Supreme Court of the United States. Actually, most of the states whose highest courts affirmed the constitutionality of the statutes did so in the 1930 and early 1940 era. Conversely, the greater bulk of the decisions declaring the statute unconstitutional have been by rulings of appellate courts in more recent years, although, of course, there are exceptions to both of the above statements.

The section of the statute involved appearing in the N.M.S. Annotated (1953) Compilation, § 49–2–2, is as follows:

"Sale below stipulated price declared unfair competition—Liability of vendor.—Wilfully and knowingly adver-

tising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 (49-2-1) of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The basic attack on the statute over the years in practically all courts has been upon the theory that § 2 of the acts provides that the sale of the trade-marked items at a price less than that stipulated to is a violation of the act, whether the seller is a party to the stipulated price contract or not. This is referred to throughout the various decisions as a "vertical agreement", fixing the resale prices of a commodity. Thus, in theory at least, if a manufacturer of a trade-marked article has a contract with one retailer in a state which fixes the minimum price, then all other retailers in that state selling the same product are bound thereby. It can be readily seen that such a provision is readily amenable to considerable litigation, the manufacturer or distributor contending that it is valid in order to protect his property interest in the trade-mark or goodwill, and the retailer who wishes to sell the same for less contending that he is the owner of the property and should be able to sell it at whatever price he desires. The above is a very great

simplification of the problem. It should be mentioned that the so-called non-signer or vertical provision of the Fair Trade Act has been determined by the Supreme Court of the United States as in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note. See Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 1045 and prior cases cited therein. Shortly after this decision in 1951 Congress passed the McGuire Act, 15 U.S.C.A. § 45, 66 Statute 632, for the specific purpose of exempting the non-signer provision from the prohibition of the Sherman Act. So much for the background of the present controversy.

Appellant contends, in the first instance, that the Fair Trade Act violates Article 4, § 38 of the New Mexico Constitution, this being the restraint-of-trade provision, which is as follows:

"The legislature shall enact laws to prevent trusts, monopolies and combinations in restraint of trade".

Appellant's argument is that at the time this provision was written into the New Mexico Constitution in 1911 the Sherman Anti-Trust Act had been in effect for twenty years, and that the Supreme Court of the United States had ruled that the Sherman Act prohibited as an illegal combination in restraint of trade the type of price-fixing scheme which is provided for in the Fair Trade Act, Dr. Miles Medical Co. v. John

D. Park and Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, and that, therefore, the members of the Constitutional Convention in writing the Constitution had in mind the Sherman Act and the decisions of the Supreme Court of the United States with respect thereto.

This argument at first blush would appear sound, were it not for the fact that the Territorial Legislature in 1891 had passed a law which provided in part as follows:

"Every contract or combination between individuals, associations or corporations, having as its object or which shall operate to restrict trade or commerce or control the quantity, price or exchange of any article of manufacture or product of the soil or mine, is hereby declared to be illegal". (Chapter 10, Laws 1891.)

It should be noted that the 1891 law which was passed a year after the Sherman Act specifically contained the word "price", which is neither in the Sherman Act nor in our constitutional provision; therefore, it would seem to follow that, if the makers of the Constitution were cognizant of the provisions and decisions with respect to the Sherman Act, they were certainly familiar with or knew the contents of the acts of the Territorial Legislature which were in effect at the time of the Constitutional Convention. It does not sound reasonable that the members of the Constitutional Convention failed to consider the verbiage of the law of 1891 so as to include the same in the Constitution and yet considered decisions under the Sherman Act. We cannot agree with counsel that in 1911 the makers of our Constitution intended to include the words, "price control", in our Constitution, nor do we see why the same should be placed therein by implication. To us it is obvious that the constitutional prohibition contained in Article IV, § 38 is aimed at preventing such monopolies and combinations as would, in effect, result in a practically complete destruction of competition. To our view, the act in question does not have that prohibitive effect and it is, therefore, determined that the so-called Fair Trade Act does not violate the afore-mentioned section of our Constitution

Appellant next contends that the Fair Trade Act deprives the appellant of property without due process of law, in violation of Article II, §§ 4 and 18 of the Constitution of the State of New Mexico. These particular sections are as follows:

"All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."

"No person shall be deprived of life, liberty or property without due process.

of law; nor shall any person be denied the equal protection of the laws."

This, to our view, raises a much more serious question than that above disposed of. It is on this point particularly that the courts of so many of our sister states have announced rulings diametrically opposed to each other, some courts ruling that the general welfare of the public would be served by such statutes and other courts ruling absolutely adversely and contrary-wise.

Some of the more outstanding cases sustaining the constitutionality of the acts are Max Factor and Company v. Kunsman, supra; Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Co., 128 Conn. 596, 24 A.2d 841; Johnson & Johnson v. Weissbard, 121 N.J.Eq. 585, 191 A. 873; Sears v. Western Thrift Stores of Olympia, Inc., 10 Wash.2d 372, 116 P.2d 756; Burche Co. v. General Electric Company, 382 Pa. 370, 115 A.2d 361.

So also some, but not all, of the decisions of the states holding to the contrary are Miles Laboratories, Inc., v. Eckerd, Fla., 73 So.2d 680; Cox v. General Electric Company, 211 Ga. 286, 85 S.E.2d 514; General Electric Co. v. Wahle, 207 Or. 302, 296 P.2d 635; Olin Mathieson Chemical Corp. v. Francis, 134 Colo. 160, 301 P.2d 139.

In addition, there are extensive annotations in A.L.R., the two latest of which are to be found at 125 A.L.R. 1335 and 19 A.L.R.2d 1139.

A great deal of the conflict arises by reason of the fact that court after court, regardless of its final holding, mentions the question of the economic philosophy of the fair trade acts. The courts which have sustained the same generally state that it is a question for the legislature to determine as to whether the economic policy as set out by the acts is wise or unwise, and that it is not a judicial function to determine this policy. Many courts and many of the individual judges will disagree as to the economic theory and it is our feeling that almost every court which has ruled upon this problem has had to draw the line between judicial responsibility and legislative policy, as stated by the Supreme Court of California in the Max Factor and Co. case, supra [5 Cal.2d 446, 55 P.2d 181]:

"The power of the court is limited to determining whether the subject of the legislation is within the state's power, and if so, to determine whether the means adopted to accomplish the result are reasonably designed for that purpose, and have a real and substantial relation to the objects sought to be attained."

The California court in this case also stated:

"Neither the State nor the Federal Constitution guarantee any personal

absolute liberty of action. The liberty guaranteed by our law is a liberty subject to regulation in the public good * * * an equal liberty rather than an absolute liberty."

Finally, in this case the court said:

"The police power is no longer limited to measures designed to protect life, safety, health, and morals of the citizens, but extends to measures designed to promote the public convenience and the general prosperity * * * and includes economic measures regulating competition * * *."

Diametrically opposed to this is the decision of the Supreme Court of Florida, which, in Miles Laboratories, Inc., v. Eckerd, supra, stated the following [73 So. 2d 682]:

"As we have stated before, the real effect of the non-signer clause is anti-competitive price fixing; not the protecting of the good will of trade marked products as other courts have held. Goodwill, it has been said, should be determined by the price which the goods can command in a competitive market, and not by the ability of the manufacturer to sell at a pegged retail price which he himself selects. Corey, Fair Trade Pricing: A Reappraisal, 30 Harv.Bus.Rev. 47, 60. Except in times of economic emergency such inflexible price arrangements which the act sanctions are not in line with our tradi-

tional concepts of free competition, which have traditionally been the 'yard stick' for protection of the consuming public. The real vice of the non-signer clause is the absence of that standard, and the decisions of this Court cited herein so hold. In removing the said standard the non-signer clause must fail as an invalid use of the police power for a private, not a public purpose."

Numerous decisions could be cited giving both sides of the argument, but with such a wealth of conflicting authorities, it is felt that no useful purpose would be gained by the citation and quotation from many of the cases from our sister states.

It is contended by appellees that Arnold v. Board of Barber Examiners, 45 N.M. 57, 109 P.2d 779, 786, places this court in the class of those courts which have refused to strike down the fair trade acts, in which this court said:

"Obviously the question of monopolies in restraint of trade as respects such matters as are now under discussion, (price fixing) yields to a more important consideration, that of reasonably exercising the police power over a business or profession having a vital relation to public welfare and health."

It should also be mentioned that in the Arnold case this Court quoted the Su-

preme Court of Minnesota, State v. Mc-Masters, 204 Minn. 438, 283 N.W. 767, with approval as to the following statement:

"The police power * * * is not limited to the protection of the public health, morals, and safety. It extends also to economic needs."

It should be borne in mind, with respect to the Arnold case, that there this court determined that the business concerned directly affected public health and it is, therefore, not directly analogous to the present case and is not authority upon which the court should rule in the instant case. It should not require any argument whatsoever to point out that the sale of electric irons having a General Electric label can in no sense affect the public health. Of course, it might be claimed that the sale of vitamin pills or alkaline tablets could in a sense affect public health, but it is not believed that they do in the sense intended by the framers of our Constitution. In fact, a great many of the articles which come under the Fair Trade Act have little or no relation to the public health in any sense. (See Shakespeare Co. v. Lippmann's Tool Shop Sporting Goods Co., 334 Mich. 109, 54 N.W.2d 268), in which the article in question was a trade-marked line of fishing tackle and in which case the Michigan court in a very well reasoned opinion concluded that the sale of fishing tackle was not in any wise affected with the public interest.

The Supreme Court of Georgia in Cox v. General Electric Company, supra, in commenting upon the decisions of other states as to the fair trade acts, made the following very pertinent statement [211 Ga. 286, 85 S.E.2d 519]:

"It is earnestly argued that a number of the supreme courts have upheld the validity of their Fair Trade Acts, which were almost, if not entirely, identical with the Georgia statute under consideration, and our attention is called to a number of decisions by the Supreme Court of the United States. We are aware of the fact that a number of the State Supreme Courts have upheld these acts, a number have not passed upon them, and others have held them invalid. We are also familiar with the conflicting decisions on this question by the Supreme Court of the United States, as pointed out in the special concurring opinion of Chief Justice Duckworth in Harris v. Duncan, supra [208 Ga. 561, 67 S.E.2d 692]. We are here, however, dealing with the statutes of this State and with the question of whether or not they violate the Constitution of the State of Georgia. What the courts of other States have decided is not controlling, and this is one of the few powers left to States to decide for themselves regardless of what the Supreme Court of the United States may or may not

have decided. We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned, we will not strike down the Constitution of our State for this purpose; neither will we follow the crowd. The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trademark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due process clause of the Constitution of the State of Georgia."

So also the Supreme Court of Oregon in General Electric Co. v. Wahle, supra, in an extremely well considered opinion held that the Fair Trade Act was void as an arbitrary and unreasonable interference with private property rights beyond the police power of the state, having no reasonable relation to public morals, health, safety or general welfare. Particularly on the issue of the police power, the Court stated at pages 644 and 645 of 296 P.2d, the following:

"Viewed from a realistic standpoint, it is difficult to find any justification for the Fair Trade Act based upon considerations of the public health, safety, morals, and welfare. We can see no real and substantial connection between the nebulous theory that fixed minimum resale prices are necessary to protect the good will of the trademark owner and the welfare of the public.

\*    \*    \*    \*    \*    \*

"In 49 Yale L.J. 607 and in 21 Chicago L.Rev. 175, are to be found exhaustive and well-written articles concerning the Fair Trade statutes by two eminent scholars, viz., Harry Shulman, Sterling Prof. of Law, Yale Law School, and Carl H. Fulda, Prof. of Law, Rutgers University, respectively. From the facts and statistics given, the accuracy of which seem beyond question, it is plainly apparent that the consumer is not benefited, but on the contrary is harmed by the operation of the Fair Trade Act. The consumer is the public. He is compelled to pay a higher price for a given commodity in order that the retailer may be guaranteed a higher fixed, and often unreasonable, profit. If Professors Shulman and Fulda are correct in their observations, and we have no reason to believe otherwise, it is obvious that the whole scheme of the Fair Trade Acts is one for private, rather than public, gain, a scheme fathered by highly organized

groups of distributors and retailers, interested not in the public weal, but only in their own selfish ends. Manifestly, such a scheme bears no relation whatever to the public morals, health, safety, or general welfare."

A very recent decision by the Supreme Court of the State of Colorado which to our view states the modern trend with respect to the holdings of courts on this subject and contains language the reasoning of which we feel should be adopted in New Mexico, in Olin Mathieson Chemical Corp. v. Francis, supra, at page 152 of 301 P.2d, the court said:

"Any act of the General Assembly which arbitrarily destroys or impairs the right of the individual to the free use and enjoyment of his property, lawfully acquired, and permits the fixing of prices for the benefit of a special group, is opposed to the constitutional concept of a free people and should not be allowed to stand. Legislation of this kind evidences the ability of organized minorities to induce legislation for their special benefit at the expense of the unorganized purchasing masses. During a recent decade numerous attempts were made to regiment the general public and in each instance they were struck down as violative of constitutional rights of a free people. We have not yet arrived at the place in America where the many must yield to the few, so that the latter may make ever increasing profits at the expense of those who still believe in the principle of free and competitive trade and commerce, untrammeled by legislative fiats.

"The Colorado Fair Trade Act does not necessarily apply to all trade-mark owners, producers and distributors. It becomes operative only as to those who elect and attempt to bind non-contracting retailers dealing in the same commodities. What today may be invalid as restraint of trade, may under our Act at the whim of the manufacturer be perfectly lawful next week. What we are saying is that such restraint of trade and destruction of price competition may thus vary from time to time at the will of the manufacturer or distributor. The Act is primarily and essentially a price-fixing statute, and unless authorized under the police power, offends against the constitution. The defendant has not obligated himself to fix resale prices at the stipulated minimum by virtue of any contract he has entered into. He is compelled to do so by the terms of this Act. We must look not to the statute, but to the contract between plaintiff and Fisher to determine the minimum price, below which the defendant shall not sell."

226

■ ■ This case is a suit in equity, and it should always be borne in mind that equity regards the substance, rather than the form. In substance, therefore, what is the real purpose of the Fair Trade Act? No matter what high-sounding terms are used, such as "free and open competition", "unfair competition," and "protection of good will", it is a matter of common knowledge that it is a price-fixing statute, designed primarily to destroy competition at the retail level. The high-sounding phrases used with respect to the trademark owners are simply excuses and not a reason for the law.

In the Old Dearborn case, supra, the court's final conclusion was that a non-signer was subject to the price-fixing provisions of the act, upon the theory that such individual, such as the appellant here, by purchasing the trade-marked goods with knowledge of the fair trade contract, impliedly assented to the contract and by such implied assent ratified, became a party to, and was bound by, the contract. This theory has been adopted by the courts which sustain the constitutionality of the statutes. In other words, they say that this is not a price-fixing statute. To us, this is an unrealistic view and to say that it is not a price-fixing statute is to deny the obvious. Once the price is fixed by contract or contracts between the manufacturer and the retailer or retailers, the non-signer is bound and the price becomes a fixed price to the non-signer. If this power of the owner of trade-marked goods to set the price at which the non-signer must sell is not the power to fix prices, then what is it? However, the courts sustaining the acts, including the Supreme Court of the United States, in effect, have been adhering to the form of the statute and overlooking the substance. This we do not feel is a proper view.

■ Although we fully realize the fact that several courts are not in complete accord upon the questions discussed in this opinion, nevertheless, we are of the opinion that the better reasoning and logic are to be found in those decisions above quoted at some length which have declared the Fair Trade Acts unconstitutional and void.

It should be noted that this particular statute is in no wise a revenue producing measure, nor does the state, as such, become a party to its effect in any way. If such were the case, an entirely different line of authority would have to be considered, but, inasmuch as this is not true, there is no necessity in lengthening this opinion by a discussion of this subject.

In view of the above, it will be determined that § 2, Chapter 44 of the Laws of 1937 (§ 49–2–2, N.M.S.A.1953) is unconstitutional and void as an arbitrary and unreasonable exercise of the police power

without any substantial relation to the public health, safety, or general welfare insofar as it concerns persons who are not parties to contracts provided for in § 1, Chapter 44, Laws of 1937 (§ 49-2-1, N.M.S.A. 1953).

Appellants have raised several additional questions, particularly with respect to the contention that the statute is unconstitutional by reason of being an unconstitutional delegation of legislative power to individuals, as establishing special-class legislation and granting special privileges and immunities and as having a defective title. These points not being necessary for this decision, they are specifically not ruled upon by the court. Neither will the court rule upon the appellant's contention that the statute is violative of the Sherman Act, either before or as amended by the McGuire Act.

The District Court of Bernalillo County will be reversed with directions to vacate its judgments heretofore entered and to enter a judgment in conformity with this opinion.

It is so ordered.

LUJAN, C. J., and SADLER and COMPTON, JJ., concur.

KIKER, J., absent from the state not participating.