[No. 34720.   *En Banc.*   November 5, 1959.]

REMINGTON ARMS COMPANY, INC., *Respondent,* v. L. JUSTON SKAGGS *et al., Appellants.*[1]

[1]Reported in 345 P. (2d) 1085.

*Keith, Winston & Repsold* (*Robert J. McNichols,* of counsel), for appellants.

*Riddell, Riddell & Williams* and *Hamblen, Gilbert & Brooke,* for respondent.

ROSELLINI, J.—This action was brought to enjoin the defendants from selling certain products below the price set by the plaintiff, pursuant to the Washington fair trade act. There is no dispute in regard to the facts. The defendants willfully and knowingly advertised, offered for sale, and sold at retail, firearms and ammunition which were manufactured by and bore the trademark, brand, or name of the plaintiff as the producer of the products. The prices at which the defendants advertised, offered for sale, and sold these products were less than the retail prices established by the plaintiff in its contract with other retailers, of which the defendants had knowledge. At the time of trial, the plaintiff had in effect approximately five hundred seventy fair trade agreements with retailers in the state of Washington. All of the contracts are identical and give the plaintiff the sole right to determine and modify the resale price of all products covered by the contracts.

None of the defendants at any time entered into fair trade contracts of any nature with the plaintiff or with any other person. The parties to the action have stipulated that the damage suffered by either party in the event of success in this action, shall be in the sum of one dollar. The plaintiff contends that the defendants are bound to sell at the price fixed for its products by virtue of the "nonsigner" provision

of the fair trade act, Laws of 1937, chapter 176, § 3, p. 685 (RCW 19.89.030), which provides:

"Wilfully and knowingly advertising, offering for sale or reselling any commodity at less than the price stipulated in any contract entered into pursuant to the provision of section 1 of this act, *whether the person* so advertising, offering for sale or selling *is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby." (Italics ours.)

The trial court enjoined the actions of the defendants and granted the plaintiff one dollar in damages. The defendants appeal. We are asked to re-examine *Sears v. Western Thrift Stores of Olympia, Inc.,* 10 Wn. (2d) 372, 116 P. (2d) 756 (1941), upholding the constitutionality of this provision.

To obtain the proper perspective for this appeal, we must first look to the act itself. In general, it provides that a producer or owner of a commodity which bears the trademark, brand, or name of the producer or owner of such commodity, and which is in free and open competition with commodities of the general class produced by others, may fix and enter into price maintenance contracts. The "nonsigner" provision, *supra,* which provides that willfully and knowingly advertising, or reselling such commodity at less than the price stipulated in a contract of this sort constitutes unfair competition whether such seller is or is not a party to the contract. The act also provides that it shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices.

In *Sears v. Western Thrift Stores of Olympia, Inc., supra,* this court held in accord with the weight of authority, that the act, providing as it did for "vertical" price fixing rather than "horizontal" price fixing, did not contravene Art. XII, § 22, of our state constitution, prohibiting monopolies.

The court further held, without discussing the relation of the act to the public welfare, that the nonsigner provision was valid as an exercise of the police power.

Several constitutional objections are raised on this appeal; however, we rest our decision on a re-examination of the

latter holding of the *Sears* case, pertaining to the validity of the provision as an exercise of the police power.

This case is not concerned with the unfair practices act (RCW chapter 19.90) which deals with the unjust discrimination involved in loss leader sales and sales below cost, and prescribes a method of computing cost. See *State v. Sears,* 4 Wn. (2d) 200, 103 P. (2d) 337 (1940). Neither is it concerned with the right of a manufacturer to fix the retail price of its product by contract with the retailer, as was *Fisher Flouring Mills Co. v. Swanson,* 76 Wash. 649, 137 Pac. 144 (1913).

The United States supreme court in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 U. S. 183, 81 L. Ed. 109, 57 S. Ct. 139, 106 A.L.R. 1476 (1936), sustained the constitutionality of the fair trade act of Illinois, including the nonsigner clause; however, the court recognized that such price fixing was still illegal in interstate commerce, being contrary to the provisions of the Sherman Anti-Trust Act, 26 Stat. 209.

To validate vertical price-fixing agreements, Congress passed the Miller-Tydings Act, of 1937, 50 Stat. 693, amending the Sherman Anti-Trust Act; however, in *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U. S. 384, 95 L. Ed. 1035, 71 S. Ct. 745, 19 A.L.R. (2d) 1119 (1951), the nonsigner provision was held invalid under the act. The court used the following language:

". . . If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion.

". . .

"Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are

dragged in by the heels and compelled to submit to price fixing."

The McGuire Act, of 1952, 66 Stat. 632, approved the subjection of nonsigners to price-fixing agreements in interstate commerce, where such restrictions are imposed by state law. This act was upheld in *Schwegmann Bros. Giant Super Market v. Eli Lilly & Co.,* 205 F. (2d) 788 (C.A. 5th, 1953), certiorari denied 346 U. S. 856, 98 L. Ed. 369, 74 S. Ct. 71.

The United States supreme court has not decided whether the fact that some states have laws of this type while others do not, tends to create an undue burden on interstate commerce, although it might well be argued that this is the case.

This court held, three judges dissenting, in *Sears v. Western Thrift Stores of Olympia, Inc., supra,* that the nonsigner clause of the fair trade act was a valid exercise of police power. But, as stated before in this opinion, the court did not point out how the health, safety, morals, or welfare of the public was affected by the legislation.

In 16 C. J. S., Constitutional Law, 939-945, § 195, it is stated:

" . . . the limit of a state's exercise of the [police] power is reached when the regulation transcends public necessity. . . .

"In order that a statute may be sustained as an exercise of the police power, . . . the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised.

" . . . The legislature may not exercise the police power for private purposes, or for the exclusive benefit of particular individuals or classes.

" . . . A statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation, or by being enacted

with a legislative declaration of a purpose which would be a proper object for the exercise of that power. . . ."

■ Thus, it is seen that to justify any law upon the theory that it constitutes a reasonable and proper exercise of police power, it must be reasonably necessary in the interest of the health, safety, morals, or welfare of the people. This exercise of police power must pass the judicial test of reasonableness.

After *Schwegmann Bros. v. Calvert Distillers, Corp., supra,* legal scholars re-examined the reasonableness and validity of the fair trade acts in the light of the actual operation of these acts. See 49 Yale L. Jour. 607, 21 Chicago L. Rev. 175, 46 Ill. L. Rev. 349, 60 Yale L. Jour. 929.

In respect to this phase of the problem, the supreme court of Oregon in *General Electric Co. v. Wahle,* 207 Ore. 302, 296 P. (2d) 635 (1956) stated:

"In 49 Yale LJ 607 and in 21 Chicago L Rev 175, are to be found exhaustive and well-written articles concerning the Fair Trade statutes by two eminent scholars, viz., Harry Shulman, Sterling Prof. of law, Yale Law School, and Carl H. Fulda, Prof. of Law, Rutgers University, respectively. From the facts and statistics given, the accuracy of which seem beyond question, it is plainly apparent that the consumer is not benefited, but on the contrary is harmed by the operation of the Fair Trade Act. The consumer is the public. He is compelled to pay a higher price for a given commodity in order that the retailer may be guaranteed a higher fixed, and often unreasonable, profit. If Professors Shulman and Fulda are correct in their observations, and we have no reason to believe otherwise, it is obvious that the whole scheme of the Fair Trade Acts is one for private, rather than public, gain, a scheme fathered by highly organized groups of distributors and retailers, interested not in the public weal, but only in their own selfish ends. Manifestly, such a scheme bears no relation whatever to the public morals, health, safety, or general welfare."

Since May, 1951, sixteen state supreme courts have declared acts of this kind unconstitutional. Generally, the acts were found unconstitutional on the grounds that legislative power had been unlawfully delegated and that they constituted improper use of the police power in that they bore no

reasonable relation to the health, safety, morals, or general welfare of the public.

The supreme court of New Mexico said in the case of *Skaggs Drug Center v. General Electric Co.*, 63 N. M. 215, 315 P. (2d) 967 (1957):

" . . . In substance, therefore, what is the real purpose of the Fair Trade Act? No matter what high-sounding terms are used, such as 'free and open competition', 'unfair competition,' and 'protection of good will', it is a matter of common knowledge that it is a price-fixing statute, designed primarily to destroy competition at the retail level. The high-sounding phrases used with respect to the trademark owners are simply excuses and not a reason for the law."

Then in declaring the nonsigner clause of the New Mexico fair trade act unconstitutional, the court said:

"In view of the above, it will be determined that § 2, Chapter 44 of the Laws of 1937, . . . [identical with § 3, chapter 176, Wash. Laws of 1937] is unconstitutional and void as an arbitrary and unreasonable exercise of the police power without any substantial relation to the public health, safety or general welfare insofar as it concerns persons who are not parties to contracts provided for in [the fair trade act]."

In *Rogers-Kent, Inc. v. General Electric Co.*, 231 S. C. 636, 99 S. E. (2d) 665 (1957), the South Carolina court declared the nonsigner clause of the fair trade act to be unconstitutional and stated:

"The right of an owner of property to fix the price at which he will sell [his property] is an inherent attribute of the property itself.

"This legislation can be justified only upon the theory that it constitutes a reasonable and proper exercise of the inherent police power of the State. We have held that such power can only be exercised where it is reasonably necessary in the interests of the public order, health, safety, morals or general welfare."

The court in holding that the fair trade act had no reasonable relation to the public order, health, safety, morals or general welfare, stated:

"It is difficult to find any justification for this legislation based upon considerations of the public health, safety,

morals and general welfare. It applies to every product bearing the trade-mark, brand or name of the producer. No distinction is made between commodities affected with a public interest and those that are not. Under the terms of the act, a non-signer has no voice whatsoever in fixing the price at which he may sell his property. By entering into a contract with a single retailer, the trade-mark owner may fix the price for all retailers, without regard to their interests or welfare. The manufacturer is not required to take into consideration the cost of his article. He may change the retail prices at will, or even terminate the contract and remove any article from the operation of the statute. It is solely up to him to say whether or not there shall be a law controlling the price at which his trade-marked article shall be sold."

In *Shakespeare Co. v. Lippman's Tool Shop & Sporting Goods Co.*, 334 Mich. 109, 54 N. W. (2d) 268 (1952), the Michigan court initiated the trend of the courts to declare the nonsigner clause of the fair trade act unconstitutional. That court held the act unconstitutional as an unlawful exercise of the state's police power for the reason that it bore no reasonable relation to the public health, safety, morals or general welfare.

The supreme court of Arkansas in *Union Carbide & Carbon Corp. v. White River Distributors*, 224 Ark. 558, 275 S. W. (2d) 455 (1955), ruled that the nonsigner clause of the fair trade act was unconstitutional as it was not protective of the public welfare and was in violation of the due process clause of the state constitution. The Arkansas court stated that it was its specific task to determine whether or not it could be reasonably said that the provisions of the nonsigner clause in any way promoted the general welfare of the people of the state. The court stated:

" . . . It is a generalization, but not an overstatement, to say that the effort to 'fix prices' is made by groups who desire to sell something for more than the sponsoring group believes that the purchasing public would pay for that 'something' without an enforced fixed price. It would seem apparent that the principal objective of minimum price maintenance is the protection of profit margins for retailers and distributors unable or unwilling to meet the pressure of competition."

The Arkansas court analyzed the effect of the act and made the following observation:

"*What the act does.* Considering the Act in relation to this particular case, it virtually gives appellant the absolute right to fix the price at which Prestone must be sold to the consuming public in Arkansas without regard to the cost of manufacture or distribution. We are not forgetting that it must first contract with one retailer in the state and appellee must have knowledge of contract and the fixed price, but these provisions consist more of form than substance and merely indicate a desperate attempt to hedge against the charge of unconstitutionality. Nobody doubts the feasibility of appellant acquiring one contract dealer out of the hundreds of retail dealers in the state, or the feasibility of bringing this information to all other dealers. If securing a contract with one dealer binds all others, then the corollary would be that, absent such contract, the others are not bound. It is frightful to think a device so easily concocted could destroy the constitutional bulwark protecting our personal liberties and the public welfare."

In *Olin Mathieson Chemical Corp. v. Francis,* 134 Colo. 160, 301 P. (2d) 139 (1956), the Colorado court sitting *en banc* declared the act unconstitutional on several grounds. With respect to the subject under discussion, the exercise of the police power, the court made the following comment:

" . . . The right to contract is a property right, protected by the due-process clause of the constitution and cannot be abridged by legislative enactment. The police power of the state exercisable by the General Assembly, while very broad, is exercisable only within the limits of the constitution. To sustain the price fixing power attempted by the General Assembly in the statute involved, under a claimed exercise of the police power, would be to place the power of the legislature above the constitution."

In concluding its decision which, as indicated, was based on several constitutional grounds, the Colorado court made the following comment, which is similar to comments found in the other decisions:

"During a recent decade numerous attempts were made to regiment the general public and in each instance they were struck down as violative of constitutional rights of a free people. We have not yet arrived at the place in America

where the many must yield to the few, so that the latter may make ever increasing profits at the expense of those who still believe in the principle of free and competitive trade and commerce, untrammeled by legislative fiats."

In the case of *Union Carbide & Carbon Corp. v. Bargain Fair, Inc.,* 167 Ohio St. 182, 147 N. E. (2d) 481 (1958), the Ohio supreme court holding the nonsigner clause invalid said:

" . . . In normal times, the inflexible price arrangements which the acts sanction are opposed to our traditional concepts of free competition for the benefit of the consuming public, and the clause binding those who do not enter into a price-fixing contract with the manufacturer offends such concepts. Hence, the nonsigner clause interferes with the constitutional right of the owner of property to dispose of it as he pleases and represents the exercise of the police power for a private as opposed to a public purpose."

■ A theory of the *Sears* case, *supra,* adopted from the opinion of the United States supreme court in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra,* was that the manufacturer of a trade-marked product retains a proprietary interest in that product by reason of the fact that he owns the trademark and the good will associated therewith, when he sells that product to a retailer, even though the retention of such an interest is not made a part of the contract of sale. If the manufacturer does have an interest in the portion of good will which goes with the trademarked product, then he is entitled to sue and recover that portion of the resale price which is attributable to such good will, and we do not think it can be seriously contended that he has such a right. In selling the product to the retailer, the manufacturer exacts a price for the use of his trademark and the benefit of the good will associated with it, as well as for the physical components of the product, and unless he also exacts an agreement that the retailer will not resell the product at less than a stipulated price, we can see no equity which should entitle him to the special protection of the law.

■ It is urged that the court should not overrule *Sears v. Western Thrift Stores of Olympia, Inc., supra,* because it has been the law for eighteen years and a substantial number of contracts have been made in reliance upon the *Sears* decision. By this, it is undoubtedly meant that many manufacturers have neglected to obtain contractual undertakings from their retailers to adhere to the prices set by the manufacturer. If so, it should be a simple matter to correct this practice in the future, and the amount of the agreed damages in this action indicates that the loss sustained by the manufacturer is not severe. At any rate, there is no showing that the hardship to manufacturers and retailers resulting from the overruling of the *Sears* case would be great enough to warrant the perpetuation of an erroneous decision.

The language of Mr. Chief Justice Fuller, in the case of *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S. 429, 39 L. Ed. 759, 809, 15 S. Ct. 673, is quoted with approval in *State ex rel. Bloedel-Donovan Lbr. Mills v. Savidge,* 144 Wash. 302, 258 Pac. 1 (1927):

" 'Manifestly, as this court is clothed with the power, and entrusted with the duty, to maintain the fundamental law of the Constitution, the discharge of that duty requires it not to extend any decision upon a constitutional question if it is convinced that error in principle might supervene.' "

■ The nonsigner clause of the fair trade act, Laws of 1937, chapter 176, § 3 (RCW 19.89.030) is declared invalid as an improper exercise of the police power, and the case of *Sears v. Western Thrift Stores of Olympia, Inc., supra,* is expressly overruled insofar as it validates the nonsigner clause.

The judgment is reversed.

WEAVER, C. J., MALLERY, HILL, and FOSTER, JJ., concur.

HUNTER, J. (dissenting)—The appellants contend that the fair trade act in question should be held unconstitutional; that the case of *Sears v. Western Thrift Stores of Olympia, Inc.,* 10 Wn. (2d) 372, 116 P. (2d) 756 (1941), should be

overruled, and if it is not overruled, the act should be held unconstitutional on other grounds not considered in the *Sears* case. Being in disagreement with the views of the majority that the *Sears* case should be overruled, all of the contentions raised by the appellants will be considered in this dissent.

The *appellants first contend* the act is in violation of Art. II, § 1, as amended by the seventh amendment of the constitution of the state of Washington, in that it delegates legislative authority to private persons without requiring the conformance to any standards prescribed by the legislature.

In the early case of *C.W. & Z. R.R. Co. v. Commissioners of Clinton County*, 1 Ohio State 77 (1852), that court made this distinction in regard to a delegation of powers as opposed to a mere grant of rights under a completed law:

" . . . The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

We have in essence followed the same reasoning in this state in regard to an unlawful delegation of legislative power. In the case of *State v. Storey*, 51 Wash. 630, 99 Pac. 878 (1909), we made the following statement in regard to a contention of unlawful delegation, which was also approved in *Royer v. Public Utility Dist.*, 186 Wash. 142, 56 P. (2d) 1302 (1936), and *Port of Tacoma v. Parosa*, 52 Wn. (2d) 181, 324 P. (2d) 438 (1958):

" . . . The mere fact that the act does not take effect until the contingency arises, does not indicate a delegation of legislative power, even where the contingency depends upon the action of certain persons. . . . In such cases it cannot be said that legislative authority is delegated. The local judgment merely accepts or rejects the operation of the legislative act. . . ."

In the instant case the legislature enacted a complete law; the mere fact that it does not become binding on others until it is invoked by a producer, does not constitute making

a law as a result of the producer's act. The producer has only the option to take advantage of the fair trade law enacted by the legislature, if his commodity is in free and open competition with commodities of the same general class produced by others.

In jurisdictions outside of this state there is a sharp division of authority as to fair trade acts similar to ours constituting an unlawful delegation of legislative power to private individuals. The line of authorities followed by the California court in its recent opinion of *Scovill Mfg. Co. v. Skaggs Pay Less Drug Stores,* 45 Cal. (2d) 881, 291 P. (2d) 936 (1955), is in conformity with the thinking of this court as expressed in *State v. Storey, supra,* which I believe to be the better rule. In the California case, the same contention of unlawful delegation was made upon the fair trade act of that state which is similar to our act. That court stated:

" . . . Here the acts of private parties in entering into contracts for the sale of commodities constitute the facts in contemplation of which the Legislature acted, and upon the existence of which the provisions of the enactment were to be applicable. The private contracts are no more legislative in character than are other acts or conduct of private parties undertaken as a prerequisite to the application of a statute. The consequence that the statute has become applicable, and conduct in violation thereof has become actionable is in no way due to the exercise of any assumed legislative power on the part of the contracting parties. . . ."

I see no unlawful delegation of legislative authority in our fair trade act in derogation of the state constitution.

It is *appellants' second contention* that the act has the effect of depriving persons of liberty and property without due process of law and constitutes legislation beyond the scope of the police power of the state, having no relation to the public health, safety, welfare or morals, all contrary to Art. I, § 3, of the state constitution which provides:

"No person shall be deprived of life, liberty, or property, without due process of law."

In the *Sears* case, *supra,* we said:

"Does the act represent a valid exercise of the legislative power? If it does, we cannot hold it to be invalid merely

because it may be an unwise law and of questionable expediency, or because it may be unable to correct the supposed evils that it is intended to remedy, or because of any other objection directed to its wisdom. This court is interested only in whether there has been a subversion of rights as guaranteed by the constitution."

We then proceeded to decide the exact issue tendered here by stating:

"That this act is a valid exercise of the police power of the state is clearly established. We held in *State v. Sears*, 4 Wn. (2d) 200, 103 P. (2d) 337, 118 A.L.R. 506, that the police power extends not only to the preservation of the public health, safety, and morals, but also to the preservation and promotion of the public welfare. Moreover, we stated that the legislature is vested with a wide discretion in determining what the public interest requires, and what measures are necessary to protect those interests. *In the case at bar, the legislature decided that trade-mark owners, distributors of identified commodities, and the public needed protection against injurious and uneconomic practices. . . .*" (Italics mine.)

Passing upon this same question the supreme court of the United States, in the case of *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U. S. 183, 81 L. Ed. 109, 57 S. Ct. 139, 106 A.L.R. 1476 (1936), held that the Illinois fair trade act, which is virtually the same as our enactment, did not violate the due process clause of the fourteenth amendment to the Federal constitution. The court there said:

"*First.* In respect of the due process of law clause, it is contended that the statute is a price-fixing law, which has the effect of denying to the owner of property the right to determine for himself the price at which he will sell. Appellants invoke the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth Amendments. [Citations omitted.] These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them. But the decisions referred to deal only with legislative price fixing. They constitute no authority for

holding that prices in respect of 'identified' goods may not be fixed under legislative leave by contract between the parties. The Illinois Fair Trade Act does not infringe the doctrine of these cases.

"  .  .  .

"Nor is § 2 so arbitrary, unfair or wanting in reason as to result in a denial of due process. We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes.  .  .  ."

I am of the opinion that appellants' second contention cannot be sustained, and that we correctly decided the question of due process in the *Sears* case, *supra*. Appellants argue, however, that if the act when it was enacted bore any relation to the public health, safety, or general welfare, such relationship has long since disappeared.

It appears to be clear that the fair trade act was a valid and necessary exercise of the police power for the protection of the general welfare. Our fair trade act was enacted in 1935 and re-enacted in 1937 (Laws of 1937, chapter 176, § 3, p. 685 (RCW 19.89.030)). The compelling reason for such legislation was aptly stated in 34 Mich. L. Rev. 691 (1936):

"It will be recalled that this practice [retail price cutting], which began its phenomenal growth shortly before the beginning of the present century, created what many believed to be two serious evils. Because it made the price of nationally advertised products vary from store to store and city to city, it forced the producer of such goods into virtual competition with himself, allowed others to capitalize on his extensive advertising campaigns, and eventually lowered his article in the eyes of the consumer. But worse than this, it drove to the wall many small retail merchants who, because of large overheads and small turnovers, could not compete. This latter not only seriously affected the public but deprived the trade-mark owner of available markets and tended to fetter competition in the retail trade." (Footnotes omitted.)

Assuming, *arguendo,* these dangers to the general welfare no longer exist in our economy is not a reason for con-

cluding that the act no longer bears a reasonable relation to the general welfare; but rather is a reason for concluding it has been effective as a protection from the dangers in the past and is effective as a protection from the same dangers that may arise from our economy in the future. It is inconceivable that a statute is a valid exercise of the police power when it functions to cure an existing evil, but becomes an invalid exercise of the police power when the evil no longer exists and the statute functions only to prevent recurrence of the same evil.

If, as appellants contend, the relation of the statute to the general welfare no longer exists, this does not make it incumbent upon the court to decide that the statute is an unreasonable exercise of the police power, because the reasonableness of the statute need not be tested by the facts which do now exist but by the facts which might reasonably be conceived to exist. We stated in *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A.L.R. 998 (1936):

"In determining whether a law comes within the police power of the state, it is not incumbent upon the court to find that facts which would justify such legislation actually exist. If a state of facts which would justify the legislation can reasonably be conceived to exist, the court must presume that it did exist and that the law was passed for that purpose. [Citations omitted.]"

This court cannot now say that such a state of facts can no longer reasonably be conceived to exist to justify this legislation. If the appellants believe the law is of questionable expediency, their appeal should be made to the legislature and not to this court.

The *appellants next contend* that the nonsigner clause of the fair trade act is in violation of Art. I, § 12, of the constitution of the state of Washington, in that it grants special privileges to a class of citizens, which privileges do not equally apply to all citizens.

In *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101 (1936), we said:

"The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution

and of the equal protection clause of the fourteenth amendment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.

"To comply with these constitutional provisions, legislation involving classifications must meet and satisfy two requirements: (1) The legislation must apply alike to all persons within the designated class; and (2) reasonable ground must exist for making a distinction between those who fall within the class and those who do not."

See, also, *Adams v. Hinkle*, 51 Wn. (2d) 763, 322 P. (2d) 844 (1958).

Here the act meets these requirements as above set forth, (1) it applies equally to all persons selling an identified commodity in free and open competition with other commodities of the same general class, and (2) reasonable grounds exist for the designation of the class by their investment and property right in the article and good will associated with it, as distinguished from the class of those producing an article which does not bear a trademark, brand, or name.

*Appellants also contend* that the fair trade act is in violation of Art. II, § 19, of the constitution of the state of Washington, in that the act embraces more than one subject and the subject embraced is not expressed in the title.

The above section of the constitution reads as follows:

"BILL TO CONTAIN ONE SUBJECT. No bill shall embrace more than one subject, and that shall be expressed in the title."

The title to the fair trade act reads as follows:

"An Act to protect trade-mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade-mark, brand or name."

In *State ex rel. Toll Bridge Authority v. Yelle*, 32 Wn. (2d) 13, 200 P. (2d) 467 (1948), we said:

"It is to be noted that this constitutional provision contains not merely one prohibition or direction to the legislature, but two, *viz*: (1) No bill shall embrace more than one subject; and (2) the subject of every bill shall be expressed in the title."

In the case of *Casco v. P.U.D. No. 1*, 37 Wn. (2d) 777, 226 P. (2d) 235 (1951), we quoted with approval this portion of American Jurisprudence, 50 Am. Jur. 178, Statutes, § 197:

" ' . . . To constitute plurality of subject, an act must embrace two or more dissimilar and discordant subjects, that by no fair intendment can be considered as having any legitimate connection with or relation to each other. Within the meaning of the constitutional provision, matters which apparently constitute distinct and separate subjects are not so where they are not incongruous and diverse to each other. Generally speaking, the courts are agreed that a statute may include every matter germane, referable, auxiliary, incidental, or subsidiary to, and not inconsistent with, or foreign to, the general subject or object of the act.' "

In *Randles v. State Liquor Control Board*, 33 Wn. (2d) 688, 206 P. (2d) 1209, 9 A. L. R. (2d) 531 (1949), we made this statement in holding a title sufficiently complied with the foregoing constitutional provision:

"A title does not need to be an index to the contents of a measure. The purpose of a title is to call attention to the subject matter of the act, so that anyone reading it may know what matter is being legislated upon, and is sufficient when it is broad enough to accomplish that purpose. All incidentals germane to a title may be brought within the legislation although not specifically referred to in such title. . . ."

In applying these rules, it is my conclusion that the Washington fair trade act embraces only one subject: the prevention of injurious and uneconomic practices involving articles distinguished by a trademark, brand or name; and that the subject is adequately expressed in the title.

The *last contention* of the appellants is that the fair trade act is violative of Art. XII, § 22, of the constitution of the state of Washington, in that it authorizes contracts for fixing the price of products and commodities.

Art. XII of our constitution is entitled "CORPORATIONS OTHER THAN MUNICIPAL" and § 22 of Art. XII provides:

"MONOPOLIES AND TRUSTS. Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any con-

tract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees or assignees of such stockholders, or with any copartnership or association of persons, *or in any manner whatever for the purpose of fixing the price* or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchises." (Italics mine.)

The appellants rely on the following language of § 22, *supra*:

". . . or in any manner whatever for the purpose of fixing the price. . . ."

We made this statement in the *Sears* case, *supra*:

"That the framers intended that § 22 of Article XII should deal with monopolies is clearly established by its reference to 'MONOPOLIES AND TRUSTS.' Moreover, a reading of § 22, giving to each word its ordinary meaning, indicates that *the language relating to price fixing cannot be lifted out of its natural context and considered apart from the rest of the provision.* The entire section must be read, construed, and applied as a whole. Thus the language in § 22 with reference to price fixing must relate to the essential purpose of the provision, namely, the prohibition of monopolies." (Italics mine.)

The best mode of ascertaining the meaning affixed to any word or sentence by a deliberative body is by comparing it with the words and sentences with which it stands connected, and a constitutional provision or a phrase in a constitutional provision must be read in connection with the context. *Noscitur a sociis* is a rule of construction applied to all written instruments. The obscurity of any particular word may be removed by reference to associated words. And the meaning of a term may be enlarged or restricted by referring to the object of the whole clause in which it is used. 11 Am. Jur. 663, § 53.

Language may not be lifted out of context to be considered independent of the remainder of the constitutional provision. It must be regarded as a whole, with effect and

meaning given to every part subjected to construction. *Sears v. Western Thrift Stores, supra; State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 Pac. 1047 (1908); *Chlopeck Fish Co. v. Seattle,* 64 Wash. 315, 117 Pac. 232 (1911).

I do not believe that the framers of the constitution meant anything more than to prohibit monopolies and trusts when they enacted this provision. Price maintenance is but one facet of a monopoly, as is the limitation of production or the regulation of transportation of a product or commodity, but it does not follow that price maintenance *per se* constitutes a monopoly.

In the case of *Fisher Flouring Mills Co. v. Swanson,* 76 Wn. 649, 137 Pac. 144 (1913), we held that a manufacturer, who has given a reputation to particular goods which he creates, has the right to fix in his contract of sale to retailers a reasonable minimum price at which those goods will be sold to consumers. We said:

" . . . *Contracts fixing prices as incidental to some main contract, and involving less than a controlling part of a given commodity in a given market, not proceeding from, nor tending to create, or to maintain a monopoly, will be sustained when the restriction is, under the circumstances of the particular case, reasonable* in reference to the interests of the parties, and reasonable in reference to the interests of the public; that is to say, when the price fixed is fairly necessary to the protection of the covenantee, and fair to the public in that it furnishes only a reasonable profit to the contracting parties. Lacking these elements, such contracts are invalid as contrary to public policy. . . ." (Italics mine.)

In the case of *Group Health Cooperative of Puget Sound v. King County Medical Society,* 39 Wn. (2d) 586, 639, 237 P. (2d) 737 (1951), this court, in a unanimous *En Banc* decision, said:

"*There is a well-settled rule, however, that Article XII, § 22, does not condemn price fixing and the limitation of production per se,* but only when either of these results is brought about in connection with a monopoly, with resulting unreasonable restraint upon competition. *Sears v. Western Thrift Stores, supra; Washington Cranberry Growers' Ass'n v. Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811,

25 A. L. R. 1077. It is therefore necessary to determine whether respondents' combination or arrangement by which production is limited and prices are fixed with respect to prepaid medical service, amounts to a 'monopoly' in the constitutional sense." (Italics mine.)

The supreme court of South Dakota, in the case of *Miles Laboratories v. Owl Drug Co.*, 67 S. D. 523, 295 N. W. 292 (1940), held that their fair trade act, which is in substance the same as the Washington fair trade act, did not violate the following provision of their state constitution:

" 'Monopolies and trusts shall never be allowed in this state and no incorporated company, co-partnership or association of persons in this state shall directly or indirectly combine or make any contract with any incorporated company, foreign or domestic, through their stockholders or the trustees or assigns of such stockholders, or with any co-partnership or association of persons, *or in any manner whatever to fix the prices,* limit the production or regulate the transportation of any product or commodity so as to prevent competition in such prices, production or transportation or to establish excessive prices therefor.

" 'The legislature shall pass laws for the enforcement of this section by adequate penalties and in the case of incorporated companies, if necessary for that purpose may, as a penalty, declare a forfeiture of their franchises.' " (Italics mine.)

The South Dakota court said:

"A monopoly such as is meant by Section 20 of Art. 17 of our Constitution exists only where all or so nearly all of a product or commodity within a community or district is brought into the hands of one man or set of men, as to practically bring the handling or production of the commodity within such single control, to the exclusion of competition or free traffic therein [citation omitted]. To render the protection against monopoly more effective, this constitutional provision prohibits certain combinations and agreements dealing with the production, transportation and price of commodities insofar as they tend substantially to stifle competition. The 'Fair Trade Law' does not purport to give the producer the right to stifle competition in a commodity. The right to stabilize the price of a 'brand' in the manner described in the act may only be acquired or maintained if the commdoity [sic] remains in free and open competition.

SDC 54.0402. An act which grants rights conditioned upon the maintenance of free competition *does not purport to authorize the making of a 'contract\* \* \* or in any manner whatever to fix the prices, \* \* \* of any product or commodity so as to prevent competition \* \* \*. . . .'* "

In the case of *Frankfort Distillers Corp. v. Liberto,* 190 Tenn. 478, 230 S. W. (2d) 971 (1950), the court, in citing *Sears v. Western Thrift Stores, supra,* among other decisions, held the Tennessee fair trade act did not violate the state constitutional prohibition against monopolies.

In the case of *State ex rel., Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805 (1927), we quoted with approval this portion of Ruling Case Law, which is now embodied in 11 Am. Jur. 659, § 50, as follows:

" '*A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable.* In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders.' 6 R.C.L. 46." (Italics mine.)

It has been the settled law in this state, by consistent and uniform interpretation, that Art. XII, § 22, of our constitution does not prohibit price maintenance *per se,* but is a prohibition against monopolies and trusts, and I fail to see that the fair trade act constitutes a monopoly or trust, thereby violating this provision of the constitution.

I am aware that there is a division of authority in other jurisdictions where the constitutionality of enactments similar to ours has been tested on the grounds we have consid-

ered. I believe, however, that the authorities sustaining the thinking expressed in this dissent are the better reasoned cases.

The *Sears* case, *supra*, which the appellants ask us to overrule, has been the law of this state for eighteen years, and I find no reasons more compelling in this appeal than we did then for holding the fair trade act unconstitutional, or in now overruling the established law of this state.

The determination of the trial court that the challenged act is constitutional should be affirmed.

OTT, J., concurs with HUNTER, J.

DONWORTH, J. (dissenting)—In my opinion, this court should not be concerned with the legislative problem of whether or not the "nonsigner" provision of the fair trade act now cures an economic evil which should be curbed under the police power of the state. It is for the legislature, not the court, to declare the public policy of this state in such matters.

In 1937, the legislature determined this matter of policy, and, in 1941, this court upheld the validity of its action as being within the police power.

What we said in *State v. Sears*, 4 Wn. (2d) 200, 103 P. (2d) 337 (1940), with respect to the constitutionality of the unfair practices act is equally applicable to the "nonsigner" provision of the fair trade act now before us:

"We may or may not agree with the economic philosophy of the unfair practices act, but it is no part of the duty of this court to determine whether the policy embodied in a statute is wise or unwise. It is primarily a legislative, and not a judicial, function to determine economic policy. If it be the declared legislative policy to curb unrestrained and harmful competition, by measures which are not arbitrary or discriminatory, it is not for us to say the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law to enforce it, the courts are both incompetent and unauthorized to deal."

Having held in 1941, in *Sears v. Western Thrift Stores of Olympia, Inc.*, 10 Wn. (2d) 372, 116 P. (2d) 756 (1941), that the "nonsigner" provision was within the police power, I

think that we should not now declare that statute to be invalid simply because, upon a re-examination of our former decision, it now appears to a majority of the court that that provision is not a reasonable exercise of the police power and that it is detrimental to the best interests of the people. Although our conception of what is for the public good may differ from that of the legislature, it is not within our province to determine such matters of legislative policy.

Furthermore, the scope of police power should not change with the personnel of the court. The portion of our decision in *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805 (1927) (quoted near the close of Judge Hunter's dissenting opinion), relating to the need for consistency and uniformity in constitutional interpretation by the courts, is, in my opinion, applicable to the present case.

I would adhere to our decision in the *Sears* case and affirm the judgment of the trial court.

FINLEY and OTT, JJ., concur with DONWORTH, J.